FIFTH DIVISION
March 5, 2010

No. 1-07-1190

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 00 CR 8223 |
| | ) | |
| ANTELETO JONES, | ) | The Honorable |
| | ) | Lawrence P. Fox, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE TOOMIN delivered the opinion of the court:

In this appeal, we must determine whether the circuit court's summary dismissal of defendant's *pro se* petition for postconviction relief comported with the recently promulgated *Hodges* standard as lacking an arguable basis in law or in fact. See *People v. Hodges*, 234 Ill. 2d 1, 912 N.E.2d 1204 (2009).

Following a jury trial, defendant, Anteleto Jones, was convicted of first degree murder, enhanced by a finding that he personally discharged a firearm during the course of the murder. He was sentenced to a total of 44 years' imprisonment. On direct appeal, we affirmed defendant's conviction and sentence. *People v. Jones*, 1-03-1316 (2004) (unpublished order pursuant to Supreme Court Rule 23). Thereafter, defendant filed a *pro se* petition for relief under the Post-Conviction Hearing Act (the Act) (725 ILCS 5/122-1 *et. seq* (West 2006)), based in part on claims of actual innocence and ineffective assistance of counsel. The trial court summarily dismissed the petition finding it to be frivolous and patently without merit. For the reasons that

No. 1-07-1190

follow, we affirm the judgment of the circuit court.[1]

## I. BACKGROUND

Defendant's convictions stemmed from the gang-related shooting of Jerry Green that occurred around 5 a.m. on January 8, 2000, on Chicago's South Side. The incident had its genesis in an ongoing gang war involving rival factions of the Gangster Disciples beginning in 1998 and continuing into January 2000. The factions, denominated the "Third Ward" and "No Limits," bordered each other's territory. The satellite groups had separated from the Disciples in 1996 after the indictment of their leader, Larry Hoover, and other members. Defendant was a member of the Third Ward faction, as were his codefendants, Melvin Jones and Travis Ashby. Lawrence Green was the chief of the No Limits. The shooting occurred in the street adjacent to Lawrence Green's residence at 7159 South Seeley. Jerry Green, the victim, was related to Lawrence, but was not affiliated with either gang faction. There were no eyewitnesses to the occurrence.

Following his arrest, defendant provided a videotaped confession admitting his participation in the offense. Defendant subsequently moved to suppress his statements asserting that he had been interrogated after electing to remain silent and invoking his right to counsel. Additionally, defendant claimed physical coercion; that he had been "pushed, shoved and punched" by the polygraph examiner at 11th and State as other officers watched. At the hearing,

[1] Oral arguments were initially heard in this case on October 20, 2009, before Justices Michael P. Toomin, John P. Tully, and Nathaniel R. Howse, Jr. In the interim between oral arguments and the filing of this opinion, Justice Tully retired, thereby necessitating the substitution of Justice James Fitzgerald Smith to replace Justice Tully. Justice Smith has read the briefs and record and has listened to the tape of the oral argument.

Officer Robert Bartik, the polygraph examiner, denied defendant's allegations, as did three detectives from Area One Violent Crimes. Although the motion was verified, defendant did not testify nor did he call any witnesses. In turn, the motion was denied.

In January 2003, defendant and Travis Ashby proceeded to trial simultaneously before separate juries. The "double jury" procedure was implemented because of interlocking videotaped confessions wherein the defendants inculpated each other as well as themselves. Melvin Jones, who had likewise inculpated his co-offenders in his videotaped statement, was tried separately immediately following defendant's conviction and sentencing.

As the mandate of first-stage review requires that we determine whether the allegations of defendant's postconviction are rebutted by the trial record, we must consider the evidence adduced at trial. In the proceedings below, the trial evidence disclosed that Jerry Green arrived at the Members Only Lounge at 71st and Halsted between 11:30 p.m. and 12 a.m. on the evening before the shooting. He visited with his friend, Curtis Moore, who managed the club, and helped him clean up and restock the bar after closing. They left the premises around 3 a.m. in Green's gray Chevrolet and, after a brief stop, drove to Moore's home at 7159 South Seeley. Green parked his car on the south side of 72nd Street, facing east toward Damen. Moore testified that Jerry was called "Old Baby" and was related to his fiancée, Yolanda Green, who lived with her family and Moore at the Seeley residence.

Green and Moore entered the kitchen through the back door. Green went to the refrigerator to look for something to eat as Moore returned a page from earlier that evening. While Moore was on the phone, Green borrowed some money for food or gas and went out the

3

door. As Moore remained on the phone, he heard 5 to 10 gunshots. Some of the gunshots seemed like they were right next to his window, while others did not sound as loud. Moore dropped the phone and woke his fiancée telling her that Old Baby had just gone outside. Because Moore could only see the side of the house next door from his bedroom, he went to the back of the house and looked through one of the windows. Although he could see that Green's car door was open, he could not see Green. He then went outside, where he found Green lying on his side in the street by the door of his car. The victim's feet were pointed toward the front of the car, his head to the rear. Moore called to Green, but received no response. He did not see who shot Green, nor did he see anyone running from the scene. As people gathered, Moore asked someone to call 911 and remained near the car until the police and ambulance arrived. Green initially was taken to Christ Hospital and eventually to the Cook County medical examiner's office.

Odis Deal, who lived nearby at 7200 South Damen, testified that he heard the gunfire at about 5 a.m. He first heard two to three gunshots, followed by a volley of eight or nine more. They all followed one right after the other. Deal had been in the Army from 1970 to 1972 and had heard gunfire before. The first two or three gunshots sounded different from the rest, like the shots were coming from two or three different guns. About five to six minutes after the firing stopped, Deal went outside to the back of his home, which was located on the southwest corner of 72nd Street and Damen. He saw police cars and an ambulance and then went back inside.

Lawrence Green testified that he resided at 7159 South Seeley along with other family members, including Curtis Moore, who was engaged to his aunt, Yolanda Green, and Cora Green, who is the mother of his son. Jerry Green was Cora's nephew and would visit his aunt monthly.

4

In the early morning hours of January 8, 2000, Lawrence was awakened by screaming in the house. He then went outside and saw Jerry lying down beside his car, which was parked on 72nd Street facing east toward Damen.

Lawrence Green acknowledged that he was the leader of the No Limits faction of the Gangster Disciples street gang. His nickname is "Motor." Green explained that the No Limits and Third Ward factions of the Disciples used to get along, but began having problems in the summer of 1998. Initially, the problems involved fighting between girls who were related to members of both factions which later led to fighting between the members. After the altercations escalated to shootings, Green and fellow gang members discussed putting out "hits" on members of the Third Ward faction.

Detective Joseph Struck was assigned to the shooting on January 8, 2000, at about 5:30 a.m. When Struck and his partner, Detective Girardi, arrived at the location beat officers had already secured the crime scene. Struck observed a gray two-door Chevrolet parked on the south side of 72nd Street facing east toward Damen. There were numerous shell casings on both sides of the vehicle and two small spots of blood on the driver's side near the rear tire. A set of keys lay nearby. Struck also noted two bullet holes in the overhead door of a garage that faced 72nd Street. The garage was in the front of the victim's car.

Forensic investigators James Shader and Carl Brasic arrived at the crime scene around 6 a.m. After speaking with the detectives, they photographed the entire scene and surrounding area. The investigators also recovered six PMC .380 auto cartridge casings, all predominately in the street alongside or immediately in front of the vehicle. Two of the .380 casings were near the

5

driver's side door toward the rear of the car. Another casing was to the rear of the car and three additional casings were recovered from the street. A fired bullet was also observed adjacent to the driver's door next to the set of keys. Additionally, they recovered two FC 9-millimeter Luger cartridge casings on the passenger side of the car at the curb area near the front of the victim's vehicle. The investigators also examined the overhead door of the garage in front of the car. Shader testified that the bullet holes appeared to be new as there was no corrosion or wear and tear in the holes themselves and the paint chips that were dislodged appeared fresh. Although the investigators gained access to the interior of the garage, they were unable to locate any spent rounds or fragments due to the accumulation of debris.

Chief Medical Examiner Edmund Donoghue performed a post-mortem examination of Jerry Green on January 9, 2000. Dr. Donoghue found evidence of five gunshot wounds and additional abrasions or scrapes. The first evidence of injury was a gunshot entry wound to the victim's right shoulder involving the heart and abdominal cavity. A medium caliber copper-jacketed bullet was recovered from the muscle beneath the skin. There was also an entry wound to the victim's left shoulder which exited the victim's left upper back. The third injury was an entry wound to the victim's lower chest which involved the abdomen and with an exit wound from the musculature of the left back. A second medium caliber copper-jacketed bullet was recovered from beneath the skin of the victim's lower back. There was another entry wound to the palm of the victim's right hand with an exit wound to the back of the hand. The fifth entry wound was noted on the back of the victim's left hand with an exit wound on the front of his left forearm.

Dr. Donoghue opined that the last two gunshot wounds would be termed defensive injuries, which occur when a victim puts his hands up in an effort to stop what is happening. Defensive wounds characteristically are indicated by the through-and-through injuries he observed. None of the wounds involved close-range firing; that is, firing from 18 inches or less from the surface of the entry wounds. Dr. Donoghue concluded within a reasonable degree of medical certainty that Jerry Green died of multiple gunshot wounds and that the manner of death was homicide.

Forensic scientist Richard Amberger received and examined the firearms evidence recovered by the investigators and the medical examiner. He concluded within a reasonable degree of scientific certainty that the six PMC .380 cartridge casings were all chambered in the same weapon. He was unable to determine whether the shell casings were actually fired from the same weapon because the breech face marks lacked the individual characteristics necessary to make an identification. However, Amberger was able to determine that the two FC 9-millimeter Luger casings were indeed fired from the same weapon. Amberger also testified that the bullets recovered from the crime scene and the autopsy had the class characteristics of a .380/9-millimeter bullet with six lands and grooves and a right twist. They could be fired from either a .380 or a 9-millimeter gun. In comparing these bullets, Amberger determined that all three were fired from the same firearm. Finally, assuming that a .357-caliber weapon was used, Amberger testified that he would not expect to find shell casings as .357 handguns are normally revolvers, which do not automatically eject their spent casings.

Detective Robert Lenihan was assigned to the follow-up investigation of the murder on

the morning of January 8, 2000. In speaking with Detectives Struck and Girardi he learned that the victim had come out of the residence at 7159 South Seeley immediately prior to the fatal shooting. Lenihan and other detectives then relocated to that address and spoke with Lawrence Green regarding the murder as well as an unrelated matter that occurred two days earlier. The detectives later returned to show photographs to Lawrence, after which they began looking for a person named Melvin Jones. When attempts to locate Melvin were unavailing, Lenihan put out a stop order directing that Jones be brought in when he was located.

On February 2, 2000, Detective Lenihan learned that Melvin Jones had been taken into custody the previous day. After Lenihan and other detectives conducted interviews of Melvin, they began looking for defendant and Travis Ashby in connection with Jerry Green's murder. Stop orders were issued for both individuals.

Officer Greg Sloyan of the Area One mission team had assisted detectives in locating people on various cases. He became apprised of the stop order on defendant and had seen his photograph. On March 3, 2000, Sloyan and his partner located defendant, placed him into custody and advised him of his *Miranda* rights. Defendant initially was taken to the 7th District and then to Area One for further processing. Travis Ashby was not arrested until August 30, 2000.

On March 3, 2000, Detective Timothy Nolan was notified that defendant had been brought to Area One on the stop order. He met with defendant at 9:15 p.m. and advised him of his *Miranda* rights. Defendant acknowledged he understood his rights and agreed to talk to the detective. In response to Detective Nolan's questioning, defendant denied participating in the

8

murder and stated that there was another person "that was just lying on him." The conversation was brief, "maybe ten to fifteen minutes at most," and Nolan then left the room. He was not involved in the initial investigation and decided to wait for the midnight officers who had handled the scene to return the investigation to them.

Detective Michael Rose responded to the original crime scene and was familiar with the progress of the investigation. He arrived at Area One at 12:30 a.m. on March 4, 2000, and was briefed by Detective Nolan before resuming his involvement in the case. Initially, Detective Rose observed defendant through the glass window in the door of the interview room where defendant appeared to be sleeping. Rose looked in on defendant again several times that morning. Around 5 a.m. he found him to be awake and sitting up. The detective then entered the room and following his *Miranda* warnings, the defendant agreed to speak.

Initially, defendant acknowledged his affiliation with the Third Ward branch of the Gangster Disciples which was led by Leonard Klein, also known as "Devo." Defendant also described the ongoing conflict between the Third Ward and the No Limits faction. He told Detective Rose that in December 1999, Lawrence Green, whom he knew as Motor, had fired a .45-caliber semiautomatic at him six or seven times near 73rd and Winchester. Defendant also related that in January 2000, he attended a meeting in Devo's garage wherein Devo stated that Motor had offered a $5,000 bounty to any No Limits member who killed a Third Ward Disciple. According to defendant, two or three days before Jerry Green was killed, Devo was arrested for shooting at Motor.

Detective Rose further testified that defendant told him that about a week after the

9

meeting in Devo's garage, Melvin Jones informed him that he had shot "Old Baby" the night before. Defendant related that Melvin stated he had hidden in a gangway across the street from Motor's house armed with a .380 semiautomatic waiting to catch Motor coming or going. Melvin told him that when Old Baby exited the rear of Motor's house and walked to a parked car he ran up to him and said, "What's up now bitch" or "What's up, bitch mother (expletive)." Old Baby got "flipping off at the mouth," after which Melvin reportedly shot him six or seven times. Melvin then told defendant that he ran to a friend's house where he hid out the rest of the night.

Rose further testified that defendant also told him of the problems he had with Melvin Jones and that Melvin did not really like him. The detective then informed defendant that his account did not make sense because if Melvin did not like him, why would he tell him all about a murder he committed. Detective Rose also observed that defendant related too many specific details about what happened from a conversation that supposedly happened almost two months earlier. He explained to defendant that it sounded like defendant was there. Defendant denied he was present and continued in his account of what Melvin purportedly had told him. Although inquiry was made, defendant was unable to account for his whereabouts from January 4 through January 10, 2000, because two months had passed since that time.

Detectives Lenihan and Farley came on duty at approximately 7 a.m. on March 4, 2000. Detective Rose reviewed the notes of his interview of the defendant with the officers before ending his shift. The detectives then met with the defendant and, after being advised of his rights, defendant once more agreed to speak. Although defendant again denied any participation in the shooting and reiterated that Melvin Jones had acted alone, the detectives told him that they had

10

evidence that more than just one individual was involved. Lenihan and Farley then left the interview room. When they returned to Area One shortly after noon, defendant, for the first time, implicated himself in the shooting.[2] At the end of the conversation the detectives called the felony review unit of the State's Attorney's office.

Assistant State's Attorney Beth Pfeiffer responded to the call and upon arrival she met with the detectives to review the course of the investigation. Ms. Pfeiffer met with the defendant at 2:15 p.m., at which time she introduced herself as an assistant State's Attorney, a prosecutor, and advised defendant of his rights. Defendant agreed to speak and they had a 30- to 45-minute conversation during the course of which defendant admitted and described his participation in the shooting. Defendant also agreed to make a videotaped statement and executed an appropriate consent. Photographs of the individuals defendant had mentioned were also obtained in preparation for the taping.

The videotaping, which was played for the jury, began at 6:17 p.m. on March 4, 2000, and ran for 18 minutes. In his statement, defendant initially provided background information regarding the "G.D.'s," which purportedly stood for "Growth and Development," and the rival factions. He identified the leader and members of the No Limits as well as the Third Ward factions, including Travis Ashby, whom he described as "Stank."

Defendant confirmed that at the end of 1999 and the early part of 2000, problems

---

[2] Although not part of the trial evidence, at the hearing on defendant's motion to suppress statements Lenihan testified that defendant agreed to undergo a polygraph examination and was taken to the 11th and State police facility. During the pretest interview with the polygraph examiner, defendant made admissions which he repeated and amplified upon his return to Area One.

developed after a sister of one of the No Limits members stabbed Devo's sister. In turn, a confrontation began with members of the factions fighting back and forth eventually leading to shootings between the two sides. Defendant also described the meeting at Devo's where he and fellow gang members were informed that the No Limits "had put $5,000 on our heads." Several days later, as he walked down 73rd Street, Motor and another No Limits member, Terrell, pulled up in a car and shot at defendant several times.

According to defendant, the catalyst for Old Baby's demise occurred on the evening of January 7, 2000. While walking within the Third Ward boundaries, defendant was met by Melvin Jones, who was crying after No Limits members had jumped on him in front of his girlfriend. Melvin was upset and embarrassed. They were joined by Stank and the three agreed that something had to be done. Stank left in his car and returned about 45 minutes later with two handguns. He gave defendant a black .357 and kept either a .45 or 9-millimeter for himself. Melvin Jones then produced a .380 semiautomatic "out of the blue." After "putting the guns up" in the alley between Damen and Seeley, the three bought beer and returned to the alley to drink it. They then retrieved the guns and walked a block and a half down the alley to 72nd Street. According to defendant, they were looking for Motor and probably would have shot him if he appeared. Instead, Old Baby came out of Motor's house, walked to his car and opened the door. At that point they approached Old Baby and Melvin said something to him like, "What's up now, bitch mother ***." Old Baby started waving his hands saying "No. I didn't have nothing to do with it." Melvin began unloading his gun and fired six or seven shots at Old Baby. Stank, who was on Melvin's right, fired two to three shots. Defendant was about 8 to 10 feet behind to the

left and fired two shots at Old Baby as he was falling.

After the shooting, defendant and Stank ran back down the alley toward 73rd Street. Stank got into his car and defendant returned the gun to him. Stank drove off alone and defendant ran to 74th Street, where he found a friend who took him home. Defendant stated that he saw Melvin and Stank a couple of days later at Devo's house. When Devo asked what had happened, Melvin told him "we handled the business."

At the conclusion of the State's case, the defendant presented an alibi defense. Defendant's mother, Audie Jones, testified that in January 2000, defendant lived with her and her husband and two siblings at 7804 South Racine in Chicago. On January 7, 2000, she came home around 11:30 p.m. and went to bed at 12:30 a.m. When Mrs. Jones awoke on the morning of January 8, 2000, at 6 a.m. all of her children were present in the house. After getting up, she went to the kitchen and could see defendant in his bed. She did not know if anyone had left the house between 12:30 a.m. and 6 a.m., as she had been sleeping during that time. The defendant did not testify nor did he present any additional witnesses.

After closing arguments, the jury was instructed by the court and retired to deliberate. As noted, the jury subsequently found defendant guilty of first degree murder of Jerry Green, enhanced by a finding that he personally discharged a firearm during the commission of the offense.

Thereafter, defendant filed a posttrial motion alleging, *inter alia*, that newly discovered evidence consisting of signed statements from two individuals who claimed to be with defendant at the time of the offense mandated a new trial. Defendant alleged that the prosecutors committed

No. 1-07-1190

a discovery violation by withholding exculpatory statements made by Anthony Thomas and Darryl Thomas. The statements, which were both dated March 17, 2003, were attached to the motion.

In his unsworn statement, denominated an "affidavit," Darryl Thomas averred:

"I do hereby state as follows: I had a party in my basement and Melvin and Antleo [*sic*] and me and my girl friend was having a party for my cousien [*sic*] and the party was over at 1:00 am because my grandfather had put ever body [*sic*] out but I snuk [*sic*] Antleo [*sic*] back in at like 1:30 am. So I did and we went to sleep and woke up at 11:00 and walked to the store. So on our way back a car pulled up and shot at us so we went down Meliven [*sic*] garage and he said that he went over their [*sic*] last night and put in some work. I told Margert [*sic*] Wood about this. Between Feb. 24, or 26.

[/s/] Darryl Thomas"

Anthony Thomas likewise asserted:

"I Anthony Thomas do hereby state as follows:

Anteledo [*sic*] was at our house the night of the shooting, my grandfather put him out at about 12:00 a.m. I let him back in the back door an [*sic*] we continued to party an [*sic*] drink until about 2:00 a.m. The [*sic*] we went to sleep and my grandfather put him out at about 6:00 a.m. or 7:00 a.m. the next morning. I talked to the state's attorney about 3 times, the first time she told me that Anteledo [*sic*] was going to trial an [*sic*] they would probably need me to testify.

[/s/] Anthony Thomas 03/17/03

14

The first time I talked to the State's attorney I told them that Anteledo [*sic*] wasn't

there so I'm not going to testify saying that he was.

[/s/] Anthony Thomas"

On March 23, 2003, at the hearing on defendant's motion for new trial, Assistant State's Attorney Margaret Wood testified that she first spoke with Darryl Thomas on February 28, 2003, well after defendant's trial had concluded. Darryl had called her from Nicollete County jail in Minnesota after receiving material witness papers served in connection with the upcoming trial of codefendant Melvin Jones. During this conversation, Darryl told her that petitioner was with him at the time of the murder.

Ms. Wood further testified that she had spoken with Anthony Thomas the week prior to the start of defendant's trial, but during that conversation they had spoken generally about the gang wars between the No Limits and the Third Ward, but did not specifically talk about the defendant. She never asked Anthony Thomas to testify and he never told her prior to trial he would not testify. After Darryl Thomas had called her from the Minnesota jail, Ms. Wood had another conversation with Anthony in her office. It took place either March 6 or 7, or March 10 or 11; in either event after, defendant's trial. On that occasion, Anthony for the first time told Ms. Wood that defendant was with him and Darryl drinking at the time of the murder. After receiving the information from the Thomas brothers, Ms. Wood contacted counsel for the defendant, as well as Travis Ashby.

Defendant's attorneys did not ask any questions of Assistant State's Attorney Wood at the hearing. Although the handwritten statements of Anthony and Darryl Thomas were attached to

the motion for new trial, neither individual was called to testify at the hearing.

In considering the motion, the trial court noted that the statements were not sworn affidavits and neither statement specified the date or location of the party. The court also found that testimony of Assistant State's Attorney Wood was credible and refuted the defense allegations that the State had knowledge of any exculpatory evidence. The court rejected the claim that the statements constituted newly discovered evidence that was not available at the time of trial as both individuals were listed in the police reports. Additionally, the court noted that the disclosures provided were not of such a conclusive nature that they would have affected the jury's verdict. At sentencing, the circuit court sentenced defendant to a term of 24 years' imprisonment for first degree murder with a 20-year enhancement based on the jury's finding that defendant personally discharged a firearm during the commission of the murder.

In the direct appeal taken from defendant's judgment of conviction the sole issue raised was whether the 20-year firearm enhancement was constitutional. On August 27, 2004, we upheld the constitutionality of the provision and affirmed defendant's conviction and sentencing. In turn, defendant filed a petition for leave to appeal, which the Illinois Supreme Court denied on December 1, 2005. *People v. Jones*, 217 Ill. 2d 580, 844 N.E.2d 43 (2005).

Thereafter, defendant commenced the instant proceeding for postconviction relief. In his *pro se* petition, defendant maintained that (1) he was actually innocent of the offense based upon newly discovered evidence consisting of affidavits from codefendant Melvin Jones, as well as other witnesses; (2) he was denied his constitutional rights by the State's failure to disclose exculpatory evidence consisting of the written statements given by Anthony and Darryl Thomas

16

prior to trial, by perjured testimony offered by the prosecutor at the hearing on his motion for a new trial, and by the State's forgery of the date on the written statements of Anthony and Darryl Thomas; (3) trial counsel was ineffective for failing to locate and present other witnesses to contradict Odis Deal, and failing to locate and present Anthony Thomas, Darryl Thomas, and other individuals as alibi witnesses, and for failing to object to his *de facto* severance from Melvin Jones; (4) appellate counsel was ineffective for failing to raise those issues on direct appeal; and (5) the trial court abused its discretion by allowing Melvin Jones to be tried separately when neither the State nor defendant had moved for a severance.

In support of his claim of actual innocence, defendant attached the affidavit of Melvin Jones, stating as follows:

"I Melvin Jones, am solely responsible for the murder of Jerry Green which occured [*sic*] in the early morning hours of Jan. 8, 2000. Upon my arrest on Feb. 2, 2000 during the course of the investigation I falsely accused Anteleto Jones as being my accomplice in this shooting.

I further state that while in custody the authorities told me []they had an idea that I was not the only individual involved in this shooting giving reason due to the recent on-going conflict between these two different factions of the gangster disciple nation; the No-Limit's and the Third Ward's, which I'm associated with the Third Ward's. Also the officers proposed a deal of leinency [*sic*] stating that I would receive a lesser charge after they contacted the state's attorney, if I were to give them information on one or more people in relation to this shooting.

17

Truthfully, I was the only individual responsible for this shooting but I seen this as an opportunity to better my circumstances. Thenceforth, I falsified information via video-confession in the presence of an officer and assistant state's attorney stating that 'Anteleto Jones accompanied by me, fired a 357mg [*sic*] handgun at the crime scene on Jan. 8, 2000.'

I depose and further state that when I received access to a telephone I contacted other members of my organization to inform them of my situation and to immediately locate Anteleto before the police picked him up to make him aware that he has to admit being present and discharging a 357 mg [*sic*] handgun at the crime scene in the early morning hours of Jan. 8, 2000 causing the death of Jerry Green; and if he refuses to adhere to those instructions then he would be violating his pledge of honor to a superior member, and as a result he or a close relative would be killed.

I further state that I was not accompanied by Anteleto Jones at the time of the murder on Jan. 8, 2000 and he was nowhere in the vicinity. Due to my current change of lifestyle and abandonment of my former ways, I could no longer live with the fact that an innocent person is incarcerated for something I'm responsible for.

I affirm that the foregoing is true except as to statements made upon information and belief, and as to those are all true facts.

/s/ Melvin Jones"

To support his ineffective assistance claim, defendant also included the written statements of Anthony Thomas and Darryl Thomas that previously were attached to his motion for new trial.

18

No other affidavits were provided.

The circuit court summarily dismissed the postconviction petition finding it to be frivolous and patently without merit. As regards defendant's actual innocence claim, the court first noted that Melvin Jones' affidavit failed to state that if called to testify Jones would have testified accordingly or would provide such testimony now. The court also determined that the recitals did not constitute newly discovered evidence because the information was available prior to defendant's trial. Moreover, the court found that the affidavit was not of such a conclusive character as to lead to a different result at trial. The judge reasoned that the videotaped statements of Melvin Jones and Travis Ashby were wholly consistent with each other and with defendant's videotaped statement as well. Additionally, Melvin Jones' statement outlined his own involvement and identified defendant as his accomplice. The court rejected the claim concluding the defendant's videotaped statement was overwhelming evidence against him and there was a significant body of other evidence corroborating all of the details provided in the statements of all three defendants.

Regarding the remaining issues, the court rejected the claim of ineffective assistance of trial counsel for failing to locate and call witnesses, finding that defendant's failure to provide affidavits or statements from Michelle Green, Cora Green, Faustina Thomas and Ben Bennett precluded consideration of those claims. As to Anthony and Darryl Thomas, the trial judge reasoned as he had previously done during his rejection of defendant's motion for a new trial, that neither statement was sworn or notarized and both lacked specific facts as to the date or location of the occurrence to support the alibi claim. The court also found the statements failed to indicate

that either Anthony or Darryl Thomas was not contacted or interviewed by defense counsel. The court further noted that both individuals were listed in the State's answer to discovery and their earlier written statements had been tendered to the defense in open court. The court thus concluded that there was no reason to conclude that defense counsel was not fully aware of the witnesses or that counsel's strategic reasons for not calling the witnesses was the least bit unsound.

Addressing counsel's failure to object to the *de facto* severance, the court reasoned that separate trials were constitutionally mandated because all three defendants made videotaped confessions which were inadmissible against each other. The court likewise found no merit to defendant's claim that the State withheld exculpatory evidence and provided perjured testimony, observing that the allegations had been refuted by the sworn testimony of Assistant State's Attorney Wood at the hearing on the motion for a new trial. Finally, the court rejected the remaining claim that appellate counsel had failed to raise meritorious issues on appeal. The instant appeal followed.

## II. ANALYSIS

The Post-Conviction Hearing Act provides a mechanism by which those under criminal sentence in this state can assert that their convictions were the result of a substantial denial of their rights under the United States Constitution or the Illinois Constitution or both. 725 ILCS 5/122-1(a) (West 2006); *People v. Coleman*, 183 Ill. 2d 366, 378-79, 701 N.E.2d 1063, 1070-71 (1998). "The purpose of the proceeding is to allow inquiry into constitutional issues relating to the conviction or sentence that were not, and could not have been, determined on direct appeal."

20

No. 1-07-1190

*People v. Barrow*, 195 Ill. 2d 506, 519, 749 N.E.2d 892, 901 (2001). In a postconviction proceeding, the trial court does not redetermine a defendant's innocence or guilt, but instead examines constitutional issues which have escaped earlier review. *People v. Rogers*, 197 Ill. 2d 216, 221, 756 N.E.2d 831, 833 (2001). As such, a postconviction petition is a collateral attack upon a prior conviction and sentence, not a substitute for or an addendum to a direct appeal. *Rogers*, 197 Ill. 2d at 221, 756 N.E.2d at 833.

Proceedings under the Act are commenced by the filing of a petition in the circuit court in which the criminal proceedings took place. See 725 ILCS 5/122-1(b) (West 2006). The petition must "clearly set forth the respects in which the petitioner's constitutional rights were violated" and shall have attached thereto affidavits, records, or other evidence supporting its allegations or shall state why the same are not attached. 725 ILCS 5/122-2 (West 2006); *Coleman*, 183 Ill. 2d at 379, 701 N.E.2d at 1071.

Postconviction proceedings not involving the death penalty contain three distinct stages. *People v. Gaultney*, 174 Ill. 2d 410, 418, 675 N.E.2d 102, 106 (1996). At the first stage, the circuit court must independently review the petition within 90 days of its filing and determine whether "the petition is frivolous or is patently without merit." 725 ILCS 5/122-2.1 (West 2006); *People v. Edwards*, 197 Ill. 2d 239, 244, 757 N.E.2d 442, 445 (2001). If the court determines that the petition is either frivolous or patently without merit, it shall dismiss the petition by written order. 725 ILCS 5/122-2.1 (West 2006). If the petition is not dismissed at stage one, it advances to the second stage, where counsel may be appointed for an indigent defendant if requested. 725 ILCS 5/122-4 (West 2006).

21

No. 1-07-1190

Section 122-2.1(c) of the Act provides that in considering the petition at the first stage, the court may examine (1) the court file of the proceedings in which the petitioner was convicted; (2) any action taken by an appellate court in such proceeding; and (3) any transcripts of such proceeding. 725 ILCS 5/122-2.1(c) (West 2006). The court should examine those records to determine whether the allegations in the petition are positively rebutted by the record. *People v. Shaw*, 386 Ill. App. 3d 704, 708, 898 N.E.2d 755, 760 (2008); *Coleman*, 183 Ill. App. 3d at 382, 701 N.E.2d at 1072 (courts have consistently upheld dismissals where allegations are contradicted by the trial record). Further, to determine whether a meritorious claim has been presented, the court must inquire into the relevance and merit of the defendant's supporting documents. *People v. Deloney*, 341 Ill. App. 3d 621, 627, 793 N.E.2d 189, 194-95 (2003) (such an assessment is implicit in conducting a first-stage review).

At stage two, the State is allowed to file a motion to dismiss or answer to the petition (725 ILCS 5/122-5 (West 2006)), and the court determines whether the petitioner has made a substantial showing of a violation of constitutional rights. *Coleman*, 183 Ill. 2d at 381, 701 N.E.2d at 1072; *People v. Hobley*, 182 Ill. 2d 404, 428, 696 N.E.2d 313, 326 (1998). Thus, at the dismissal stage of the proceeding, whether under section 122-2.1 or under section 122-5, the court is concerned solely with determining whether the petition's allegations sufficiently demonstrate a constitutional infirmity which would necessitate relief under the Act. *Coleman*, 183 Ill. 2d at 380, 701 N.E.2d at 1071. The circuit court is foreclosed from engaging in any fact-finding at a dismissal hearing as well-pleaded facts are to be taken as true at this point in the proceeding. Factual disputes raised by the pleadings require a determination of the truth or falsity

22

of the supporting documents which cannot be properly made at a dismissal hearing; they can only be resolved through a third-stage evidentiary hearing. *Coleman*, 183 Ill. 2d at 380-81, 701 N.E.2d at 1071-72.

In the instant appeal defendant has limited the issues to his claims of newly discovered evidence of actual innocence and ineffective assistance of both trial and appellate counsel. Defendant assails the circuit court's summary dismissal of his petition, asserting that the petition stated the gist of a meritorious claim in each of its particulars.

As a threshold matter, we question defendant's strident reliance on the "gist" standard that formerly governed the circuit court's first stage review of postconvictions petitions. Prior to 1983, section 122-2 of the Act simply required, *inter alia*, that a petition "clearly set forth the respects in which petitioner's constitutional rights were violated." Ill. Rev. Stat. 1981, ch. 38, par. 122--2. The 1983 amendment providing for first-stage dismissals was consistent with the legislature's purpose in providing for a simplified procedure in order to insure that the criminal justice system's limited resources were expended where most needed. *People v. Rivera*, 198 Ill. 2d 364, 372, 763 N.E.2d 306, 310 (2001). With the advent of summary dismissals our supreme court determined that a petitioner need only present a "gist"of a constitutional claim at this stage. *People v. Porter*, 122 Ill. 2d 64, 74, 521 N.E.2d 1158, 1161 (1988); see also *Gaultney*, 174 Ill. 2d at 418, 675 N.E.2d at 106 (to survive dismissal at this stage a defendant need only present a limited amount of detail in the petition). Adherence to the "gist" standard continued to endure over the years. *People v. Torres*, 228 Ill. 2d 382, 394, 888 N.E.2d 91, 100 (2008); *Edwards*, 197 Ill. 2d at 244, 757 N.E.2d at 445; *Coleman*, 183 Ill. 2d at 380-81, 701 N.E.2d at 1071.

Notably, with time, the dynamics of first-stage review revealed a degree of tension between the "gist" standard and the "frivolous and patently without merit" test governing summary dismissals. Recently, in *People v. Hodges*, 234 Ill. 2d 1, 912 N.E.2d 1204 (2009), the Illinois Supreme Court resolved our concerns:

"[O]ur use of the term 'gist' describes what the defendant must allege at the first stage; it is not the legal standard used by the circuit court to evaluate the petition under section 122-2.1 of the Act, which deals with summary dismissals. Under that section, the 'gist' of the constitutional claim alleged by the defendant is to be viewed within the framework of the 'frivolous or *** patently without merit' test. *** Thus, under the Act, a petition which is sufficient to avoid summary dismissal is simply one which is *not* frivolous or patently without merit." (Emphasis in original). *Hodges*, 234 Ill. 2d at 11, 912 N.E.2d at 1209.

Recognizing that neither "frivolous" nor "patently without merit" was defined in the Act, the *Hodges* court provided needed clarification:

"[A] *pro se* petition seeking postconviction relief under the Act for a denial of constitutional rights may be summarily dismissed as frivolous or patently without merit only if the petition has no arguable basis either in law or in fact." *Hodges*, 234 Ill. 2d at 11-12, 912 N.E.2d at 1209.

Moreover, the court provided further insight as to the guideposts to be used in meeting the "arguable basis" standard: "A petition which lacks an arguable basis either in law or in fact is one which is based on an indisputably meritless legal theory or a fanciful factual allegation. An

24

example of an indisputably meritless legal theory is one which is completely contradicted by the record." *Hodges*, 234 Ill. 2d at 16-17, 912 N.E.2d at 1212, citing *People v. Robinson*, 217 Ill. 2d 43, 838 N.E.2d 930 (2005) (rejecting claim that appellate counsel was ineffective for failing to argue on direct appeal that out-of-court identification of defendant was inadmissible hearsay where record showed that the statement at issue fell within the hearsay exception for spontaneous declarations). Fanciful factual allegations include those which are "fantastic or delusional." *Hodges*, 234 Ill. 2d at 17, 912 N.E.2d at 1212.

On appeal from a first-stage dismissal, our review is *de novo*. *Robinson*, 217 Ill. 2d at 60, 838 N.E.2d at 940. Although the trial court's reasons for dismissing a petition may provide assistance to this court, we review the judgment, and not the reasons given for the judgment. *People v. Lee*, 344 Ill. App. 3d 851, 853, 801 N.E.2d 969, 972 (2003).

### A. Actual Innocence Claim

With these principles in mind, we now consider defendant's claim of actual innocence based upon newly discovered evidence. As noted, defendant's culpability at trial was essentially premised on his videotaped confession acknowledging his presence and participation in the shooting death of Jerry Green. Additionally, as the circuit court observed, there was a significant body of evidence corroborating the details provided by defendant in his statement.[3] In the instant proceeding defendant maintained that he was not present at the crime scene and denied

---

[3] Although the circuit court may have exceeded the scope of section 122-2.1(c) of the Act by including the videotaped statements of the codefendants in its analysis, the reference to those materials may have been deemed necessary to refute the allegations of Melvin's affidavit. In any event, as our *de novo* review is of the judgment, rather than the circuit court's reasons, materials *dehors* the trial record do not impact our analysis or conclusions.

participation in the shooting. As noted, in support, defendant attached the affidavit of his convicted codefendant, Melvin Jones, who is presently incarcerated in the Illinois Department of Corrections.[4]

In Melvin Jones' affidavit he avers that he is "solely responsible" for the murder of Jerry Green; that he was not accompanied by the defendant and that defendant was nowhere in the vicinity. Melvin maintains that during the course of his custodial questioning he falsely accused defendant as being his accomplice in the shooting; that the police suggested that he was not the only individual involved in the shooting and "proposed a deal of leniency" if he could involve one or more others in the shooting. Melvin claims that he viewed this invitation as an opportunity to "better my circumstances" and provided false information "via video confession" stating that "Anteleto Jones accompanied by me, fired a .357 caliber handgun at the crime scene on June 8, 2000." Melvin further avers that while in custody he contacted other "members of my organization" to get the word to defendant that he had to "admit being present and discharged a .357 handgun at the crime scene *** causing the death of Jerry Green;" that if defendant "refuses to adhere to those instructions" he would be violating his pledge of honor to a superior member and either "he or a close relative would be killed."

### 1. Factual Basis

During the course of its first-stage review, the trial court properly revisited the trial record to determine whether the proceedings rebutted the allegations of Melvin Jones' affidavit. Judge

---

[4] In their respective affidavits, both Melvin Jones and the defendant aver to be in Randolph County, which suggests that they were incarcerated at the same correctional facility at the time of filing.

Fox not only presided over the entirety of defendant's trial proceedings, including pretrial motions, jury trial, and posttrial motions, but also over the postconviction proceeding. He could well conclude, as do we, that the trial record is stocked with abundant evidence contradicting the recitals of Melvin Jones' affidavit.

Defendant's actions following his arrest and during custodial questioning provide an appropriate starting point for our analysis. Initially, we discern that the operative premise of the actual innocence claim, that Melvin's threats of harm to defendant or his family compelled him to falsely confess to the murder, is clearly contradicted by defendant's postarrest actions. Rather than submitting to Melvin's demands, defendant steadfastly denied his own participation and instead implicated Melvin in the murder. He persisted in proclaiming his innocence to three different teams of detectives for over 12 hours until he first made admissions to the polygraph examiner. In turn, his initial assertions of innocence gave way to a detailed explanation of the shooting, highlighting Melvin's involvement while minimizing his own participation. Defendant also gratuitously included Travis Ashby, although that aspect of his revelations was not encompassed within Melvin's purported demands. Defendant's present claim of coercion is also belied by the acknowledgment in his videotaped statement that no one had made any threats causing him to give the statement.

We find further contradictions of record inuring from defendant's verified motion to suppress his statements litigated during the course of the pretrial proceedings. In that motion, defendant swore that he was illegally interrogated despite his election to remain silent and invocation of his right to counsel. Additionally, he claimed physical, psychological and mental

coercion, that he "was pushed, shoved and punched by the polygraph examiner at 11th and State while two other officers looked on." Although decidedly spurious, these allegations are clearly at odds with defendant's present claim that in reality he was coerced by Melvin Jones' threats of harm.

Significance necessarily is found in the particulars of defendant's videotaped statement. Notably, although not directed to include Travis Ashby, defendant nonetheless offered substantial accusatory details of Stank's participation. According to defendant, it was Stank who drove the group to the area and provided two of the weapons fired at the victim. Defendant's statement, which includes details not provided by Melvin Jones, describes the group's activities prior to the shooting, including purchasing and drinking beer, as well as describing the particular alley used to reach the crime scene. Additionally, defendant offers details immediately preceding the shooting, including Old Baby opening his car door and waving his hands around as he was confronted by Melvin Jones. Dependant's presence was likewise manifested by the tears he wiped from his eyes at the videotaping when identifying a photograph of the victim.

Moreover, we find defendant's confession to be corroborated by the trial evidence, thereby contradicting Melvin Jones' contention that he was the sole gunman. Curtis Moore's testimony that when he looked out his window he saw Old Baby's car door open is consistent with defendant's rendition. Likewise, the medical examiner's testimony characterizing the two injuries to Old Baby's hands as defensive wounds is consistent with defendant's description that the victim was waving his hands as he was being shot. Furthermore, the evidence clearly established that at least two weapons were used in the shooting. Odis Deal, who had experienced

gunfire during his army service, perceived firing from two or three guns. Also, according to Curtis Moore, Old Baby left the house just prior to Curtis hearing 8 to 10 gunshots, some louder than others. Additionally, Investigator Shader recovered two different types of ammunition from the crime scene. Although forensic scientist Amberger was unable to state whether the .380 casings had been fired from one weapon, he was able to determine that the two 9-millimeter casings were indeed fired from the same firearm. Defendant's admission that he fired two shots at the victim from .357 is also corroborated by the absence of .357 ammunition from the crime scene[5]. As Amberger testified, he would not expect to find .357 casings as spent cartridges must be manually ejected from revolvers.

In determining the merits of defendant's factual allegations, we are guided by the supreme court's recent clarification of the standard governing first-stage dismissals. Under *Hodges*, our concerns no longer focus upon whether the defendant has presented the gist of a constitutional grievance, but rather whether the petition is frivolous and patently without merit. As noted, a petition is subject to summary dismissal where it lacks an arguable basis in law and fact. *Hodges*, 234 Ill. 2d at 11, 912 N.E.2d at 1209. In defining the contours of frivolous factual allegations, the *Hodges* court recognized that it previously had relied on federal *habeas corpus* decisions in interpreting and applying our Act. "Our reliance on such case law is particularly apt in this instance because the General Assembly patterned section 122-2.1 of the Act after the federal *in forma pauperis* statute, 28 U.S.C. § 1915." *Hodges*, 234 Ill. 2d at 12, 912 N.E.2d at 1210.

---

[5] Although defendant's videotaped statement does not specify the type of weapon he fired, in his oral statements to Detective Lenihan and Assistant State's Attorney Pfeiffer, he acknowledged that the handgun was indeed a revolver.

No. 1-07-1190

Thus, the court found instructive the interpretation of "frivolous" articulated by the United States Supreme Court in *Neitzke v. Williams*, 490 U.S. 319, 327, 104 L. Ed. 2d 338, 348, 109 S. Ct. 1827, 1833 (1989) ("those claims whose factual contentions are clearly baseless"); see also *Denton v. Hernandez*, 504 U.S. 25, 33, 118 L. Ed. 2d 340, 350, 112 S. Ct. 1728, 1733 (1992) ("a finding of factual frivolousness is appropriate when the facts alleged rise to the level of the irrational or the wholly incredible").

Applying the "arguable basis" test to the instant petition leads to the inescapable conclusion that defendant's claim of actual innocence is based on fanciful factual allegations which are indeed baseless. To give credence to defendant's claim requires determinations that are "incredible and beyond the limits of human belief." *Mannen v. Norris*, 338 Ill. 322, 327, 170 N.E. 273, 275 (1930). We would be required to conclude that defendant's postarrest actions encompassing his initial denials to the police, as well as the false accusations which followed, were simply a ruse. However, the totality of the scenario he has offered is lacking any semblance of logic. Assuming, for example defendant indeed was directed and programmed by Melvin Jones to confess *ab initio*, this leaves unresolved the necessity of frustrating the efforts of the police and polygraph examiner for a period of over 12 hours. Moreover, defendant offers no explanation as to his motivation for misleading his counsel causing his attorney to make spurious allegations of police coercion and misconduct thereby expending needless courtroom hours if the script he now claims to have followed actually called on him to confess.

The veracity of that scenario likewise pales in light of defendant's earlier denials. Understandably, we are troubled too by the contradiction reflected in defendant's letter to his

30

parents dated October 3, 2000, attached to his postconviction petition as exhibit K(1), where he acknowledged: "No gang member threatened me to do it." Additionally, assuming that Melvin had only ordered defendant to admit his own presence and participation in the shooting, we are perplexed by defendant's need to not only include, but also to stress the participation of Stank in the plot, to the extent reflected in defendant's videotaped statement. We find further contradiction inuring from Melvin's direction that defendant admit he fired a .357, given Melvin's awareness that in addition to his .380 semiautomatic, a 9-millimeter was fired. The defendant has provided no adequate answer to these questions, nor do we discern that any exists.

It is axiomatic that our appraisal of defendant's claim does not include credibility assessments as at this stage of the proceeding we are foreclosed from engaging in any fact finding. *Coleman*, 183 Ill. 2d at 380-81, 701 N.E.2d at 1071. Nonetheless, we are directed to make a determination as to whether defendant's factual allegations rise to the level of the irrational or are wholly incredible. The trial record to be sure reflects that defendant's efforts to provide an alibi defense were unavailing at trial as well as in the posttrial proceedings. His belated third attempt to do so within the framework of postconviction review clearly manifests a fanciful act of desperation.

Credibility assessments aside, our appraisal of defendant's claim calls to mind the facts in *Coulson*, where the victim and sole witness to an alleged robbery testified that "the five men who took his wallet, at gun point, voluntarily accompanied him to his home, and permitted him to go inside alone while they obligingly waited outside, trusting that their victim would keep his promise and not call the police." *People v. Coulson*, 13 Ill. 2d 290, 296, 149 N.E.2d 96, 99 (1958). Not

surprisingly, in reversing Coulson's conviction, our supreme court rejected this testimony, finding that it "taxes the gullibility of the credulous." *Coulson*, 13 Ill. 2d at 296, 149 N.E.2d at 99.

It also harkens back to *People v. O'Connor*, 412 Ill. 304, 106 N.E.2d 176 (1952), where the victim of alleged multiple rapes and crimes against nature, which purportedly occurred in Des Plaines, testified that after the assaults, the defendants drove her to various taverns where many people were present, that she drank beer and was allowed to use the ladies room and the telephone, and that she was then driven through the streets of Chicago and entered a restaurant alone, making no outcry while her assailants waited outside in their car. On appeal, the court reversed, concluding that the evidence revealed "improbabilities and inconsistencies" which tended to make her claim incredible. *O'Connor*, 412 Ill. at 309, 106 N.E.2d at 178 (1952). Earlier, in *People v. Buchholz*, 363 Ill. 270, 277-78, 2 N.E.2d 80, 83 (1936), the court likewise found unconvincing the testimony of the alleged victim that the defendant, although unarmed, after robbing her and finding she had only 15¢, then accompanied her to the door of her home, gave her his correct name and telephone number and requested that she call him. The common thread of these narrations have "greater value as fiction than as credible evidence." *Coulson*, 13 Ill. 2d at 295, 149 N.E.2d at 98. We have little difficulty in concluding that the incredible factual assertions supporting defendant's claim of actual innocence likewise "taxes the gullibility of the credulous," and, therefore, lacks an arguable basis in fact. *Hodges*, 234 Ill. 2d at 11, 912 N.E.2d at 1209.

## 2. Legal Basis

As noted, in the proceedings below, the trial judge also rejected defendant's petition

reasoning that Melvin Jones' affidavit did not constitute newly discovered evidence and that its recitals were not of such a conclusive character as to lead to a different result upon retrial. We agree. We find *People v. Collier*, 387 Ill. App. 3d 630, 900 N.E.2d 396 (2008), instructive:

> "Among the touchstones for judging claims of actual innocence is the requirement that the evidence adduced by the defendant must first be 'newly discovered.' That means it must be evidence that was not available at a defendant's trial and that he could not have discovered sooner through due diligence. The evidence must also be material and noncumulative. *People v. Morgan*, 212 Ill. 2d 148, 154, 817 N.E.2d 524, 527-28 (2004). In addition, it must be of such conclusive character that it would probably change the result on retrial. *People v. Barrow*, 195 Ill. 2d 506, 540-41, 749 N.E.2d 892, 913 (2001)." *Collier*, 387 Ill. App. 3d at 636, 900 N.E.2d at 403.

An unbroken line of precedent holds that evidence is not newly discovered when it presents facts already known to a defendant at or prior to trial, though the source of those facts may have been unknown, unavailable or uncooperative. *People v. Coleman*, 381 Ill. App. 3d 561, 568, 886 N.E.2d 534, 541 (2008); *People v. Barnslater*, 373 Ill. App. 3d 512, 523, 869 N.E.2d 293, 303 (2007); see also *People v. Moleterno*, 254 Ill. App. 3d 615, 625, 627 N.E.2d 129, 136 (1993) (weapon could not be considered as "newly discovered" where defendant knew of its existence and in whose possession it was in well in advance of trial); *People v. Chew*, 160 Ill. App. 3d 1082, 1086, 513 N.E.2d 1099, 1101 (1987) (rejecting claim of newly discovered evidence where defendant knew about the evidence prior to trial); *People v. Jones*, 26 Ill. App. 3d 78, 82-84, 325 N.E.2d 56, 60-61 (1975) (claim of newly discovered evidence rejected where

defendant knew that an uncooperative witness had made a statement favorable to him and was available for subpoena).

Further support for this principle derives from our supreme court's holding in *People v. Harris*, 206 Ill. 2d 293, 794 N.E.2d 181 (2002), where, on postconviction review, the defendant presented the affidavits of his brothers in support of his claim of actual innocence. Both brothers averred that the defendant was home with them in his basement apartment watching a movie at the time of the shooting. *Harris*, 206 Ill. 2d at 300-01, 794 N.E.2d at 187. Rejecting the claim that this evidence could be considered newly discovered, the supreme court reasoned:

> "[C]learly, the fact that defendant was allegedly with his brothers on the night of the crime could have been discovered sooner. More importantly, defendant is the source of this information and was armed with this information at the time of trial." *Harris*, 206 Ill. 2d at 301, 794 N.E.2d at 188.

An identical result obtained in *People v. Davis*, 382 Ill. App. 3d 701, 889 N.E.2d 622 (2008). In *Davis*, during the postconviction proceedings the defense presented the affidavit of an eyewitness to defendant's arrest that corroborated some of the defendant's version at trial. *Davis*, 382 Ill. App. 3d at 712, 889 N.E.2d at 633. In rejecting the claim of newly discovered evidence, our Second District rationally concluded that the affidavit "does not contain any facts that defendant would not have known at or prior to his trial." *Davis*, 382 Ill. App. 3d at 712, 889 N.E.2d at 633.

We recognize that in *People v. Molstad*, 101 Ill. 2d 128, 461 N.E.2d 398 (1984), our supreme court found that the affidavits of codefendants attesting that the defendant was not

present when the victim was assaulted satisfied the requirement of being "newly discovered" notwithstanding defendant's awareness of the evidence before trial. *Molstad*, 101 Ill. 2d at 134-35, 461 N.E.2d at 402. However, we find the facts in *Molstad* clearly distinguishable from the instant case.

First, in *Molstad*, the affidavits were presented after the codefendants had been found guilty, but prior to sentencing. Therefore, the affiants put themselves at risk because their own credibility could be a factor in the assessments of their ultimate penalty. *Molstad*, 101 Ill. 2d at 134, 461 N.E.2d at 401. Conversely, here, Melvin Jones' affidavit was executed August 24, 2004, some 17 months after his own trial. Hence, his admissions could have no bearing upon his ultimate disposition. Second, in *Molstad*, the codefendants averred that they did not testify or come forward on Molstad's behalf because they could not do so without damaging their own defensive position. *Molstad*, 101 Ill. 2d at 132, 461 N.E.2d at 401. Here, Melvin Jones' affidavit is lacking any allegation that he would have come forward earlier on defendant's behalf but for his own exposure. Third, although Melvin's affidavit purports to exonerate defendant, his false accusations of defendant's complicity had no relevance to the evidence in the trial proceedings. Because of the *de facto* severance, Melvin's accusatory statements to the police were simply never a consideration in defendant's trial.

Moreover, as noted, the newly discovered evidence must be of such conclusive nature that it would probably change the result on retrial. *Barrow*, 195 Ill. 2d at 540-41, 749 N.E.2d at 913. Here, an analysis of Melvin Jones' affidavit fails to instill an abiding belief that his averments fulfill that requirement. Although brief in scope, the affidavit is, to be sure, rather cleverly drawn.

35

While the averments purport to inculpate Melvin, his concession that he is "solely responsible" for the murder of Jerry Green is simply a *non sequitur*. Nowhere in the affidavit does Melvin actually inculpate himself. There is no admission that he conjured up the plan of revenge for the embarrassment he suffered, that he discharged the weapon that killed Green or, for that matter, that he even was present at the crime scene. His gratuitous acknowledgment of being "solely responsible" is simply a meaningless assemblage of words that could simply acknowledge that the events leading to Jerry Green's demise were precipitated by the beating he suffered in the presence of his girlfriend. Thus viewed, the affidavit is simply a benign gesture; it reveals no facts upon which a meaningful prosecution of Melvin could be pursued.

Lastly, the trial court found Melvin's affidavit to be flawed because it did not contain a statement that Melvin would actually testify to the facts alleged in the affidavit. In *People v. Brown*, 371 Ill. App. 3d 972, 864 N.E.2d 767 (2007), as in the case *sub judice*, in support of his free-standing claim of actual innocence, petitioner attached an affidavit from his codefendant, Smith. As here, the codefendant averred that defendant was not present when the offense occurred. *Brown*, 371 Ill. App. 3d at 982, 864 N.E.2d at 775-76. Although the matter proceeded to third stage review, we nonetheless found that the affidavit was insufficient to merit consideration at the hearing:

> "Smith does not affirmatively aver that he would have testified to the contents of his affidavit at defendant's trial. An affidavit must not only identify the source and character of the evidence, it must also identify the availability of the alleged evidence." *Brown*, 371 Ill. App. 3d at 982, 864 N.E.2d at 776.

We also find instructive *People v. Johnson*, 183 Ill. 2d 176, 700 N.E.2d 996 (1998), where the supreme court focused upon the general requirements of the Act. As the court noted there, section 122-2 requires the defendant to support his allegations of constitutional violations by " 'affidavits, records, or other evidence.' " *Johnson*, 183 Ill. 2d at 190, 700 N.E.2d at 1003, quoting 725 ILCS 5/122-2 (West 1994). As in *Brown*, the court determined that the "allegations must be accompanied by an affidavit which identifies with reasonable certainty the source, character, and availability of the alleged evidence." *Johnson*, 183 Ill. 2d at 190, 700 N.E.2d at 1003; see also *People v. Johnson*, 154 Ill. 2d 227, 240, 609 N.E.2d 304, 310 (1993). Although the foregoing decisions relate to second- or third-stage proceedings, because the requirements of affidavits are basic, there is a dearth of authority suggesting a different interpretation should govern first-stage dismissals.

Based upon the foregoing considerations, we find that defendant's claim of actual innocence was indisputably meritless. Accordingly, the trial court correctly concluded that the claim was frivolous and patently without merit.

### B. Ineffective Assistance of Trial Counsel

We next consider defendant's claim of ineffective assistance of trial counsel inuring from counsel's failure to present additional alibi witnesses whose testimony allegedly could have changed the outcome of the proceedings at trial. In support of the claim, defendant's petition attached the handwritten statements of Anthony Thomas and Darryl Thomas offered during the hearing on defendant's motion for new trial. The statements purport to establish that defendant was present at the witnesses' home on the night of the shooting. Defendant maintains that the

petition presented the gist of a meritorious ineffectiveness claim because counsel failed to investigate, locate and call the individuals to testify at trial or during the hearing on the motion for new trial. The defendant also challenges appellate counsel's effectiveness for failing to raise the issue on direct appeal.

Initially, the State responds by asserting that defendant presented the same statements of Anthony Thomas and Darryl Thomas during his motion for new trial. The trial court examined the statements, considered testimony and heard arguments before denying the motion. The State contends that, as the substance of Anthony and Darryl Thomas' statements and their existence as potential witnesses was litigated during the trial proceedings, the issue could have been raised on appeal. Thus, the State maintains that issues that could have been raised on direct appeal but were not are considered forfeited. *People v. Williams*, 209 Ill. 2d 227, 807 N.E.2d 448 (2004). Nonetheless, precedent dictates that the forfeiture bar will be relaxed where the waiver stems from the ineffectiveness of appellate counsel. *Williams*, 209 Ill. 2d at 233, 807 N.E.2d at 452.

However, we do find merit in one aspect of the State's argument. Defendant's postconviction petition makes no mention of trial counsel's ineffectiveness in failing to call the witnesses at the hearing on defendant's motion for new trial. Nor, for that matter, does the petition raise the issue of appellate counsel's ineffectiveness for failing to raise the issue of trial counsel's actions at the hearing or for not contesting the trial court's rejection of the posttrial motion. As these portions of defendant's present claims were not included in his *pro se* petition, we deem them to be forfeited. See 725 ILCS 5/122-3 (West 2006); *People v. Jones*, 213 Ill. 2d 498, 507-08, 821 N.E.2d 1093, 1098 (2004) (issues not raised in a dismissed postconviction

petition cannot be raised for the first time on appeal).

Claims of ineffective assistance of counsel are evaluated against the familiar two-prong test delineated in *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984); and *People v. Albanese*, 104 Ill. 2d 504, 473 N.E.2d 1246 (1984). Importantly, the *Strickland* standard applies equally to claims of the ineffective assistance of appellate counsel. *People v. Golden*, 229 Ill. 2d 277, 283, 891 N.E.2d 860, 864 (2008).

To prevail on a claim of ineffective assistance under *Strickland*, a defendant must show that counsel's performance fell below an objective standard of reasonableness and there is a reasonable probability prejudice occurred as a result. *People v. Villarreal*, 198 Ill. 2d 209, 228, 761 N.E.2d 1175, 1185 (2001). Sufficient prejudice will be found to exist where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068; *People v. Erickson*, 183 Ill. 2d 213, 224, 700 N.E.2d 1027, 1032 (1998). "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceeding. *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.

Guided by the foregoing principles, we now consider whether the trial court correctly dismissed defendant's ineffective assistance claim as frivolous and patently without merit. We must determine whether it is arguable that counsel's performance fell below an objective standard of reasonableness and it is arguable that the defendant was prejudiced. *Hodges*, 234 Ill. 2d at 16-17, 912 N.E.2d at 1212.

### 1. Factual Basis

In determining whether defendant's allegations arguably demonstrate trial counsel's deficient performance, we must revisit the events that transpired during the course of the posttrial proceedings. As seen, the motion for new trial alleged that the prosecution violated discovery procedures by withholding exculpatory statements made by Anthony Thomas and Darryl Thomas. However, both statements reflected they were given on March 13, 2003, some 45 days after defendant's trial concluded.

Moreover, at the posttrial hearing, the notion of any discovery violation was clearly dispelled. Assistant State's Attorney Wood testified that she first spoke with Darryl Thomas on February 23, 2003, after defendant's trial had concluded. Darryl had called her from a Minnesota jail in response to material witness papers served upon him in connection with the upcoming trial of Melvin Jones. During this conversation, Darryl stated that he was with defendant at the time of Jerry Green's murder. In turn, Ms. Wood re-interviewed Anthony Thomas in her office in early March, and for the first time was told that defendant was drinking with him and Darryl at the time of the shooting. Both individuals then provided statements which were tendered to defense counsel and, in turn, were attached to defendant's motion.

The trial court also clarified that the State's answer to discovery, filed April 20, 2000, identified both Anthony and Darryl Thomas as prospective witnesses, expressly stating that their written statements had been tendered to the defense in open court. The court also found significant the absence of any affidavits or sworn statements attesting that trial counsel had not interviewed Anthony or Darryl, nor did the statements of either witness contain such averments. In denying the motion for new trial, the court rejected the argument that the disclosures were of

such a conclusive nature that they would have affected the verdict.

In the postconviction proceedings that followed, Judge Fox reiterated his earlier analysis and findings as to the tendering of the statements, their content, and their inability to affect the verdict. Moreover, the court determined that there was no reason to believe that defense counsel was not fully aware of the witnesses or that counsel's strategic reasons for not calling them at trial was the least bit unsound. We agree and therefore conclude that defendant failed to provide any arguable factual basis demonstrating that counsel's performance fell below an objective standard of reasonableness.

### 2. Legal Basis

We also address the question of whether defendant's legal theory that counsel was ineffective for failing to present the testimony of Anthony and Darryl Thomas was indisputably meritless. As in *Hodges*, this question focuses on defendant's theory of defense at trial and whether the testimony from the witnesses would arguably support this theory. See *Hodges*, 234 Ill. 2d at 19, 912 N.E.2d at 1213.

At trial, defendant interposed the defense of alibi. Essentially, the defense maintained that defendant was home asleep in his bed when the shooting occurred. In support of that theory, the defendant offered the testimony of his mother, Audie Jones. Although defendant did not elect to testify, there is little reason to doubt that he subscribed to the defense theory offered by his counsel at trial. In a letter to his parents dated March 25, 2000, attached to his postconviction petition as exhibit K(2), defendant stated:

"I know damn well I was in the house at the time. I am not going to cop out for some

time over some shit I didn't do. I'm talking about trial now ***."

Here, assuming Anthony and Darryl testified consistently with the recitals of their statements, their testimony would have placed defendant at a different location than his home. As such, the evidence would have conflicted with the trial testimony of Mrs. Jones and would also have been inconsistent with the glaring admission we have gleaned from defendant's letter to his parents.

Under these circumstances, we find *People v. Barr*, 200 Ill. App. 3d 1077, 558 N.E.2d 778 (1990), instructive. In *Barr*, a residential burglary prosecution, the State's undercover agent testified that he purchased stolen stereo equipment from defendant at a housing project. Defendant testified that he had met with the agent on the day in question and sold him narcotics, but denied selling any stolen property. Following conviction, defendant sought postconviction review, alleging trial counsel's ineffectiveness for failing to interview three witnesses who would have corroborated his alibi defense. In affirming the dismissal of defendant's petition, the *Barr* court first noted that because the defendant had presented no alibi at trial there was no alibi defense for defendant's alleged witnesses to corroborate. *Barr*, 200 Ill. App. 3d at 1081, 558 N.E.2d at 780-81. The court further reasoned:

> "Under such circumstances, it can hardly be said that failure to call the alleged alibi witnesses constituted ineffective assistance of counsel. Indeed, it could well be argued that trial counsel would have been incompetent had he called these witnesses as their testimony would have contradicted Barr's and all but ensured his conviction."
> *Barr*, 200 Ill. App. 3d at 1081, 558 N.E.2d at 781.

42

We perceive that the same rationale applies to the case at bar. Counsel's decisions on what evidence to present and what witnesses to call are routinely considered matters of trial strategy. *People v. Munson*, 206 Ill. 2d 104, 139, 794 N.E.2d 155, 175 (2002); *People v. Enis*, 194 Ill. 2d 361, 402-03, 743 N.E.2d 1, 24 (2000). Such decisions are generally cloaked with immunity from claims of ineffective assistance of counsel. *People v. West*, 187 Ill. 2d 418, 432, 719 N.E.2d 664, 673 (1999). Further, counsel's strategic decisions will not be second-guessed, "the fact that another attorney might have pursued a different strategy is not a factor in the competency determination." *People v. Palmer*, 162 Ill. 2d 465, 476, 643 N.E.2d 797, 802 (1994), citing *People v. Hillenbrand*, 121 Ill. 2d 537, 548-49, 521 N.E.2d 900, 904-05 (1988).

In the case *sub judice*, the court also concluded that the viability of defendant's petition was further compromised by the absence of supporting attachments. It is of course well settled that a claim that trial counsel failed to investigate and call witnesses must be supported by an affidavit from the proposed witness. *Enis*, 194 Ill. 2d at 380, 743 N.E.2d at 13. In the absence of such an affidavit, a reviewing court cannot determine whether the proposed witness could have provided testimony or information favorable to the defendant, and further review of the claim is unnecessary. *Enis*, 194 Ill. 2d at 380, 743 N.E.2d at 13. The requirement of supporting attachments is likewise codified in section 122-2 of the Act, providing that "[t]he petition shall have attached thereto affidavits, records, or other evidence supporting its allegations or shall state why the same are not attached." 725 ILCS 5/122-2 (West 2006).

Defendant maintains that the language of the statute does not necessarily require affidavits. Relying on *People v. Bates*, 324 Ill. App. 3d 812, 755 N.E.2d 139 (2001), defendant

argues that the provision clearly allows for other forms of supporting documents. In *Bates*, despite the absence of an affidavit, the court found support for defendant's ineffectiveness claim from police reports which referenced the importance of the missing witness. *Bates*, 324 Ill. App. 3d at 815-16, 715 N.E.2d at 142-43. However, in *Bates*, as distinguished from the instant case, the State never contested the statements. *Bates*, 324 Ill. App. 3d at 815-16, 715 N.E.2d at 143; see *People v. Smith*, 268 Ill. App. 3d 574, 581, 645 N.E.2d 313, 318 (1994) (failure to attach affidavits is not necessarily fatal to postconviction petition where allegations stand uncontradicted and are supported by the record).

However, in the case *sub judice*, the handwritten statements of Anthony Thomas and Darryl Thomas are neither sworn nor notarized. They are also contradicted by the trial record. Moreover, the statements are lacking specific detail. As the trial court noted, "neither of these statements mentions any date or address to support the defendant's alleged alibi claim, and more importantly *** neither statement indicates in any way that either of these people *** was never contacted or interviewed by defense counsel." Further, the statements are contradictory as to when defendant awoke and left the grandfather's home. According to Anthony, his grandfather put defendant out about 6 or 7 a.m. the next morning. Curiously, Anthony also admits that "[t]he first time I talked to the State's Attorney I told them that Anteledo [*sic*] wasn't there so I'm not going to testify saying that he was." Darryl, on the other hand, states that "we [he and defendant] went to sleep and woke up at 11:00 and walked to the store."

The circuit court concluded that the posttrial disclosures provided by Anthony and Darryl Thomas were not of such a conclusive nature that they would have affected the verdict. We

concur in that determination and further find that defendant's challenge to trial counsel's competency was itself indisputably meritless. We conclude that the entirety of the posttrial proceedings fails to establish deficient performance on defendant's behalf or resulting prejudice.

### C. Ineffectivess of Appellate Counsel

We last address defendant's remaining claim, that appellate counsel was ineffective for failing to raise the issue of trial counsel's effectiveness on direct appeal. As noted, the two-prong *Strickland* standard applies equally to claims of ineffective assistance of appellate counsel. *Golden*, 229 Ill. 2d at 283, 891 N.E.2d at 864. Accordingly, "[a] defendant who contends that appellate counsel rendered ineffective assistance, *e.g.*, by failing to argue an issue, must show that the failure to raise that issue was objectively unreasonable and that, for this failure, defendant's conviction or sentence would have been reversed." *People v. Griffin*, 178 Ill. 2d 65, 74, 687 N.E.2d 820, 828 (1997). If the underlying issue is nonmeritorious, the defendant has suffered no prejudice. *People v. Rogers*, 197 Ill. 2d 216, 222, 756 N.E.2d 831, 834 (2001).

We are of course mindful that counsel is not obliged to raise every conceivable issue on appeal and it is not incompetence of counsel to refrain from raising issues which, in counsel's judgment, are without merit, unless counsel's appraisal of the merits is patently wrong. *People v. Smith*, 195 Ill. 2d 179, 190, 745 N.E.2d 1194, 1201 (2000); *People v. Easley*, 192 Ill. 2d 307, 329, 736 N.E.2d 975, 991 (2000). It is well settled that appellate counsel's choices concerning which issues to pursue are entitled to substantial deference. *Rogers*, 197 Ill. 2d at 223, 756 N.E.2d at 835.

Here, we decline to deem patently erroneous appellate counsel's assessment of the record

45

and decision not to raise the issue asserted by defendant. Although defendant challenged trial counsel's performance during the posttrial hearing, our understanding of what transpired yielded no deficiencies. The State's pretrial disclosures identified Anthony and Darryl Thomas as potential witnesses and also reflected that the original statements of the witnesses had been tendered in open court. Because defendant was jointly indicted with Melvin Jones, it is a reasonable assumption that while Anthony and Darryl may have had relevant information, those disclosures concerned Melvin rather than the defendant. Trial counsel confirmed this appraisal in his motion for new trial where he alleged that the exculpatory nature of the newly tendered statements "was not referred to in any of the police reports." As such, trial counsel's decision not to call either witness at trial was objectively reasonable. To the same extent, we perceive that appellate counsel's decision not to pursue this issue on appeal was likewise objectively reasonable.

Even assuming counsel's decision not to raise this issue on appeal did conceivably constitute deficient performance, we are unable to discern that defendant suffered any prejudice. The record fails to demonstrate a reasonable probability that had this issue been raised, a different result would have obtained on appeal. We therefore find no error in the circuit court's denial of relief on this component of defendant's petition as it is clearly lacking any arguable basis in law or in fact.

### III. CONCLUSION

For the foregoing reasons, we affirm the judgment of the circuit court summarily dismissing defendant's postconviction as frivolous and patently without merit. We further grant

the State's request for assessment of costs and incorporate in our judgment a fee of $100 for defending this appeal and also an additional fee of $50 for oral argument.

Affirmed.

FITZGERALD SMITH, J., concurs.

HOWSE, J., dissents.

No. 1-07-1190

JUSTICE HOWSE, dissenting:

I must respectfully dissent.  Unlike my colleagues in the majority, I do not believe *Hodges* directs us to take such a broad approach to our analysis of whether a petition is based on an indisputable meritless legal theory or a fanciful factual allegation.

Although defendant confessed to the murder prior to trial, his postconviction petition raised a claim of actual innocence.  Defendant attached an affidavit from Melvin Jones, a codefendant, in support.

In Melvin's affidavit, he states he falsely accused defendant as being his accomplice in the shooting.  Melvin states he falsified his video confession and forced defendant to confess in an effort to obtain a more lenient sentence from the State.  Additionally, Melvin averred he was able to force defendant to confess because he contacted members of his gang to relate to defendant a threat that he had to admit to being present and discharging a gun at the crime scene or either a family member or a friend of defendant would be killed.  Melvin further states defendant was not present at the scene of the shooting.  Melvin now admits to being "solely responsible" for committing the crime at this time because he has changed his lifestyle and amended his former ways and could "no longer live with the fact that an innocent person is incarcerated for something I'm responsible for."  The final page of his affidavit is signed, sworn and notarized.

As the majority correctly notes, the question before us is "whether defendant's petition had no arguable basis either in law or in fact, *i.e.*, whether it was based on an indisputably meritless legal theory or a fanciful factual allegation."  See *Hodges*, 234 Ill. 2d at 17.

Our supreme court has based its definition of fanciful and delusional claims on recent

48

federal *habeas corpus* cases such as *Neitzke v. Williams*, 490 U.S. 319, 104 L. Ed. 2d 338, 109 S. Ct. 1827 (1989); *Koetting v. Thompson*, 995 F.2d 37 (5th Cir. 1993), and *Weeks v. Jones*, 100 F.3d 124 (11th Cir. 1996). See *Hodges,* 234 Ill. 2d at 13. Examples of "factual fanciful allegations" identified by federal courts include: a defendant's claim that he was drugged and raped 28 times by inmates and prison officials at different institutions (*Denton v. Hernandez*, 504 U.S. 25, 118 L. Ed. 2d 340, 112 S. Ct. 1728 (1992)); a claim that Robin Hood and his Merry Men deprived prisoners of their access to mail or that a genie granted a warden's wish to deny prisoners any access to legal texts (*Lawler v. Marshall*, 898 F.2d 1196, 1199 (6th Cir. 1990)); and a prisoner's claim that prison guards intentionally put metallic substances in the prisoner's food (*Evans v. Six Unknown Federal Prison Guards*, 908 F.2d 975 (1990)(table)).

The majority concludes defendant's petition is based on fanciful factual allegations. To reach this conclusion, the majority points to defendant's postarrest behavior as circumstantial evidence that the petition allegations are unlikely to be true. According to the majority, Melvin's affidavit cannot possibly support defendant's claim of actual innocence in this case because it "leaves unresolved the necessity of frustrating the efforts of the police and polygraph examiner for a period of over 12 hours." Slip op. at 30. The majority concludes that in order to believe Melvin's affidavit, "[w]e would be required to conclude that defendant's postarrest actions encompassing his initial denials to the police, as well as the false accusations which followed, were simply a ruse." Slip op. at 30. The majority also takes issue with the fact that Melvin claims sole responsibility for the shooting even though the evidence presented at trial suggested two guns were used, and that defendant implicated Stank in the plot although not allegedly directed to

do so by Melvin.

In support of their definition of fanciful and delusional, the majority cites *People v. Coulson*, 13 Ill. 2d 290, 149 N.E.2d 96 (1958), *People v. O'Connor*, 412 Ill. 304, 106 N.E.2d 176 (1952), and *People v. Buchholz*, 363 Ill. 270, 2 N.E.2d 80 (1936). Those cases do not involve either first-stage hearings under the modern Post-Conviction Hearing Act or similar fact patterns to the facts and issues presented here.

Contrary to the majority's contention, several plausible alterative explanations exist that could explain defendant's allegedly incongruent postarrest behavior. For example, defendant may have needed time to consider Melvin's threat and whether he was going to allow himself to be convicted for a crime he did not commit. He also may have been showing bravado to Melvin by not confessing. Moreover, neither the fact that the trial evidence suggests two guns were involved in the murder nor the fact that defendant implicated another individual in the murder during his confession irrefutably suggests Melvin's statements that defendant was not present for the murder are fanciful.

The majority is also troubled by a letter defendant apparently sent to his parents prior to trial, which was attached to his petition as exhibit K(1), where defendant said "No gang member threaten [sic] me to do it." The majority, however, does not discuss defendant's other statements in the letter that "I went into the station and I was scared and weak-minded and fucked up and told a lie on my damn self, which is the dumbest shit I could have ever done," and that "I was scared and shook up in the police station and went along with just about the same shit Melvin said after they showed me his statements on paper and the video of him." The majority also does not

50

discuss or make mention of an earlier letter defendant apparently sent to his parents on March 25, 2000, which was also attached as part of exhibit K to the petition, where he specifically said he was shown a transcript of Melvin's videotaped confession by the police prior to making his own confession. The March 25 letter provides a plausible explanation as to how defendant could be so familiar with the details surrounding the murder when he gave his videotaped statement, a major concern of the majority in finding defendant's claim fanciful.

Simply put, nothing in the record before us concretely disproves or rebuts the allegations found in Melvin's affidavit. Resolving the apparent factual incongruities created between defendant's pretrial behavior and the claims in his petition necessarily requires a credibility determination that the majority identifies as "axiomatic" to avoid at this stage of review. The majority's thinly veiled credibility determination becomes apparent when it specifically refers to Melvin's statements as "simply a meaningless assemblage of words" in a subsequent portion of the opinion. Slip op. at 36. The correct standard in evaluating the factual allegations before us in the petition is to determine whether they are fantastic or delusional, not to consider whether they are unlikely in light of the evidence adduced at trial.

While the allegations in defendant's petition and Melvin's affidavit might appear somewhat unlikely given the record before this court, I fail to see how unrebutted allegations that defendant confessed to the murder based on a threat from Melvin and was not present when the murder occurred can properly be described as fantastic or delusional. As the *Hodges* court noted, " '[s]ome improbable allegations might properly be disposed of on summary judgment, but to dismiss them as frivolous without any factual development is to disregard the age-old insight that

51

many allegations might be "strange, but true; for truth is always strange, Stranger than fiction".' " *Hodges,* 234 Ill. 2d at 13 n.5, quoting *Denton v. Hernandez,* 504 U.S. 25, 33, 118 L. Ed. 2d 340, 350, 112 S. Ct. 1728, 1733-34 (1992).

Any direct challenge to Melvin's or defendant's credibility is premature at this stage of review.  See *People v. Coleman,* 183 Ill. 2d 366, 380-81, 701 N.E.2d 1063 (1998) ("our past holdings have foreclosed the circuit court from engaging in any fact-finding at a dismissal hearing because all well-pleaded facts are to be taken as true at this point in the proceeding").  Moreover, "a belief that allegations are unlikely, without more, is insufficient to justify dismissing a petition." *Hodges,* 234 Ill. 2d at 19, citing *Denton*, 504 U.S. at 33, 118 L. Ed. 2d at 350, 112 S. Ct. at 1733-34.  Accordingly, I cannot say the factual allegations presented in Melvin's affidavit are irrational or wholly incredible.  See *Hodges,* 234 Ill. 2d at 13.

In addition, the majority maintains Melvin's affidavit is not newly discovered evidence because it presents facts already known to the defendant prior to trial.

In *People v. Molstad*, 101 Ill. 2d 128 (1984), our supreme court held the affidavit of a convicted codefendant constitutes newly discovered evidence because such an affidavit could not have been acquired before the codefendant's conviction on the same charges.  The court held:

> "The affidavits submitted as the basis for a new trial could
> not have been discovered with the exercise of due diligence. The
> record reveals that the defendants were acquainted with each other,
> and presumably due diligence on the part of Molstad or his counsel
> could have ascertained what posture the codefendants would have

taken at trial. However, no amount of diligence could have forced the codefendants to violate their fifth amendment right to avoid self-incrimination [citation] if the codefendants did not choose to do so." *Molstad*, 101 Ill. 2d at 135.

The majority distinguishes *Molstad*, noting the affidavits in that case were presented after the codefendants had been found guilty, but prior to sentencing. The majority also notes the codefendants in *Molstad* specifically averred they did not testify or come forward because they could not do so without damaging their own defensive position. Lastly, the majority notes that although Melvin's affidavit "purports to exonerate defendant, his false accusations of defendant's complicity had no relevance to the evidence in the trial proceedings." Slip op. at 35.

The majority's contentions clearly go to the weight Melvin's affidavit should be given, not to whether it constitutes newly discovered evidence under *Molstad*. The weight the affidavit should be given is a totally different analysis than what is appropriate at this stage of review.

Furthermore, the majority maintains Melvin's "cleverly drawn" affidavit is irrefutably flawed because nowhere in it does he actually inculpate himself. The majority also finds Melvin's affidavit flawed because it does not contain a statement that Melvin would actually testify to the facts alleged in the affidavit at a new trial. Noting that newly discovered evidence must be of such conclusive nature that it would probably change the result on retrial (*Barrow*, 195 Ill. 2d at 540-41), the majority concludes an analysis of the affidavit "fails to instill an abiding belief that his averments fulfill that requirement." Slip op. at 34.

In making its determinations, the majority overlooks the distinction the legislature has

made between first-stage review in noncapital and capital postconviction cases. Section 122-1(a)(2) requires a defendant in a capital case to establish a substantial basis of actual innocence during the first stage of review. 725 ILCS 5/122-1(a)(2) (West 2006). In the first stage of a noncapital postconviction petition, however, a defendant is not required to sustain the higher burden of presenting a substantial claim of innocence until the second-stage hearing. *People v. Edwards*, 197 Ill. 2d 239, 246, 757 N.E.2d 442 (2001). At the first stage this court should only be concerned with whether the petition lacks an "arguable basis in fact," not whether the allegations reveal sufficient facts "upon which a meaningful prosecution of Melvin could be pursued." Slip op. at 34; see *Hodges*, 234 Ill. 2d at 19.

While a *pro se* petition is clearly not expected to set forth a complete and detailed factual recitation at the first stage of review, " 'it must set forth some facts which can be corroborated and are objective in nature or contain some explanation as to why those facts are absent.' " *Hodges*, 234 Ill. 2d at 10, quoting *People v. Delton*, 227 Ill. 2d 247, 254-55 (2008). I would find defendant's petition and the signed, sworn and notarized affidavit from Melvin attached in support have done just that. It is also important to note that if defendant's *pro se* petition advanced to the second stage of review, a lawyer would be appointed and an opportunity presented to amend the affidavit and petition to possibly cure the defect identified by the majority.

In reaching the above conclusions I do not mean to suggest defendant's claims would ultimately prove meritorious. That is not the standard by which we review a first-stage petition. I simply find defendant's *pro se* petition should be allowed to proceed to the next stage of review. I respectfully dissent and would find the trial court erred in summarily dismissing defendant's

54

postconviction petition.