2021 IL App (1st) 191500-U

No. 1-19-1500

Order filed October 21, 2021

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 03 CR 18004 (02) |
| | ) | |
| ANDRE TYSON, | ) | Honorable |
| | ) | Domenica A. Stephenson, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE MARTIN delivered the judgment of the court.
Presiding Justice Reyes and Justice Rochford concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm the circuit court's dismissal of defendant's second stage postconviction petition over his contention that he made a substantial showing of a constitutional claim of actual innocence based on newly discovered evidence.

¶ 2    Defendant Andre Tyson appeals from the circuit court's order dismissing his second stage petition for postconviction relief pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2010)). On appeal, he argues that his petition made a substantial showing of

a constitutional violation by setting forth a claim of actual innocence supported by newly discovered evidence from his codefendant Leonard Brown's affidavit. We affirm.[1]

¶ 3                                    I. BACKGROUND

¶ 4      Following simultaneous but severed 2005 jury trials, Tyson and Brown were convicted of the first degree murder of Rashee Lewis (Lewis).[2] Tyson was convicted under an accountability theory and sentenced to 45 years' imprisonment.

¶ 5      The evidence at trial established that on August 7, 2003, at around 2 a.m., in the vicinity of 92nd Street and Cottage Grove Avenue in Chicago, 16-year-old Lewis was shot and killed. Miyako Rosenthal testified she was sitting in her vehicle with a friend at that time and observed a maroon Chevy Impala with four individuals inside drive up behind her vehicle. She then observed a young man in a red shirt, later identified as Lewis, run northbound on Cottage Grove Avenue, and then turn west onto 92nd Street. Lewis ran on the sidewalk toward the Impala and "appeared scared." Moments later, Rosenthal heard approximately nine gunshots, at which time she ducked. She discerned a handgun was being fired out of the back window of the Impala. Following the shooting, Rosenthal observed the Impala drive away and run a red light at 93rd Street. A police cruiser began pursuing the Impala. Rosenthal then exited her vehicle and observed Lewis lying in the street in a pool of blood. She did not see any weapons on or near Lewis's body.

¶ 6      Chicago Police Officer Lawrence Lee, and his partner, Officer Valerio[3], heard shots fired while on patrol in the area of 92nd Street and Cottage Grove Avenue in the early morning hours

---

[1]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

[2]Brown is not a party to the instant appeal.

[3]Officer Valerio's first name was not provided in the record.

of August 7, 2003. "Unknown citizens" flagged down the officers and informed them that a maroon Impala was responsible for the shooting. After learning this information, Lee continued to travel down Cottage Grove Avenue, where he observed the suspect Impala driving at a high rate of speed. Lee activated his lights and pursued the Impala, which he temporarily lost sight of when it turned a corner. However, Lee reacquired visual contact with the suspect vehicle and pulled it over. Tyson, whom Lee identified in court, was the sole occupant in the Impala. The officers arrested Tyson. As Officers Lee and Valerio were placing Tyson in their police cruiser, they noticed two men, later identified as Christopher Jones and Adam Knox, hiding behind a nearby parked vehicle.

¶ 7      A trace evidence analyst testified he performed gunshot residue tests on Tyson, Knox, and Jones. All three tests were negative.

¶ 8      Christopher Jones testified he, Brown, and Knox were in Brown's vehicle in the early morning hours of August 7, 2003. After driving to a gas station near 92nd Street and Cottage Grove Avenue, they heard eight or nine shots fired. Jones did not know where the shots came from. Brown, who was angry about the gunshots, drove to 105th Street and Indiana Avenue, where they observed Tyson. Brown got out of the vehicle and spoke with Tyson, who then joined them in the Impala. Jones was "real drunk" and knew Tyson and Brown were talking but did not know what they said. He later testified he heard something about a firearm but did not hear Tyson respond. They drove to 107th Street and Indiana Avenue, where Tyson went inside a house and subsequently exited the residence with a black handgun and bulletproof vest.

¶ 9      When Tyson returned to the vehicle, he got in the driver's seat and gave the vest and firearm to Brown, who was seated in the back passenger seat next to Jones. Knox was seated in the front

passenger seat. Brown directed Tyson to drive to where the shooting occurred. Brown wanted to return to the scene because "they shot at his car," and he was going to shoot at "them." When they arrived at 92nd Street and Cottage Grove Avenue, they observed one of the men who shot at them wearing a red shirt, and Brown fired a few shots out the window of the back passenger seat. Jones testified that Brown fired the handgun in an upward direction but "hit the young man." The man in the red shirt had been running away from the vehicle at the moment he was shot. Jones did not see the man with a weapon. Following the shooting, the police were "immediately on" them. Tyson drove the Impala to a nearby alley, and Jones, Knox, and Brown jumped out of the vehicle and ran. Police found Jones and Knox nearby and took them to the police station, where Jones gave a handwritten statement.

¶ 10    Jones acknowledged he previously appeared before the grand jury, where he testified that Brown fired shots directly at the man in the red shirt. He had also testified that Brown asked Tyson if he had a firearm and told Tyson that he wanted revenge against the people who shot at his vehicle. Jones explained the discrepancy as resulting from a brain tumor that affected his mental ability at the time he gave his earlier statements.

¶ 11    Adam Knox testified to a substantially similar version of events as Jones. Knox attested he was with Jones and Brown on the night of the shooting. They heard gunshots after leaving a gas station and drove to 105th Street and Indiana Avenue, where Tyson had been. Brown was mad and explained to Tyson that they had been shot at while driving. Tyson entered the Impala and they drove to 107th Street and Indiana Avenue, where Tyson lived, so they could "handle something." Brown asked Tyson if he had a handgun and Tyson responded "yes," although Brown did not tell Tyson why he wanted the firearm or what he was going to do with it. Knox acknowledged that he

had given a handwritten statement and testified before the grand jury. He conceded that he had previously testified that Brown stated he wanted a firearm because they had been shot at. However, Knox stated he did not recall testifying that Brown said he was going to "shoot them back."

¶ 12 Both Brown and Tyson exited the vehicle at 107th Street and Indiana Avenue. When they returned to the Impala, Knox observed that Tyson had a black handgun and bulletproof vest. Brown sat in the back passenger seat of the vehicle with the handgun, while Tyson drove. Knox acknowledged testifying before the grand jury that, when Tyson and Brown reentered the Impala, they all discussed what had happened and who would shoot, with Brown volunteering to shoot because he had the firearm.

¶ 13 When they returned to 92nd Street and Cottage Grove Avenue, a man was running toward the vehicle as they drove down the street. Knox was seated in the front passenger seat and heard two or three gunshots coming from behind him in the vehicle, although he acknowledged that he told the grand jury there were three or four gunshots. He did not see anything in the hands of the person running. After the shooting, Tyson drove off and Knox exited the Impala shortly thereafter with Jones and Brown. Knox observed Tyson get pulled over by police, and thereafter, he and Jones were stopped by a police officer. Knox initially lied to police about where he had been, but he was nonetheless taken to the police station.

¶ 14 Although Knox testified at trial that Tyson did not say anything while he was in the Impala, he acknowledged testifying before the grand jury that Tyson asked Brown if he knew who shot at him and Tyson stated that he had a pistol. Knox further acknowledged that Tyson did not initially have a handgun and directed Brown to go to 107th Street and Indiana Avenue, where he lived. Knox explained the discrepancy in his testimonies by stating he was scared when he was in front

of the grand jury and was "actually agreeing to anything they said." He conceded, however, that no one told him what to say. He further acknowledged he was testifying at trial because he was subpoenaed and did not want to be there.

¶ 15    Assistant State's Attorney (ASA) Michael Clarke testified that he presented both Knox and Jones to the grand jury. Clarke published portions of Knox's grand jury testimony to the jury. Knox had testified Brown told Tyson he got shot at and asked whether Tyson had a pistol. Brown wanted to take the pistol to "[g]o over there and shoot them back." Tyson asked whether Brown knew who had shot at him and said he had a pistol. Brown told Tyson that he knew who shot at him. The group then drove to 107th Street and Indiana Avenue to Tyson's house. Tyson exited the Impala, while the others waited inside the car. When Tyson returned, he had a pistol and bulletproof vest. In the vehicle, the group discussed what was going to happen next. Brown, who at that time possessed the handgun, said he would shoot it. Tyson drove to Cottage Grove Avenue and 92nd Street. Clarke testified he did not tell Knox what to say before the grand jury.

¶ 16    Forensic expert, Doctor John School Denton testified at trial that he had analyzed the autopsy reports and concluded that the entry and exit wounds of the bullets were consistent with Lewis running away from the car at the time he was shot. The bullet had traveled slightly upward through his skull, which was consistent with a gun having been fired from a car. Lewis's facial lacerations, including torn lips and loose front teeth, were consistent with someone falling forward while in forward running motion. The injuries "were not consistent with someone just dropping and falling." Denton noted that there was no evidence of close firing range. On cross-examination, Denton noted it was possible, though unlikely, that the bullet that killed Lewis had ricocheted. Denton testified that a bullet that ricochets off something before striking a person would likely be

more deformed and flatter than the bullet that killed Lewis. He further testified that the bullet's slight deformation was consistent with the deformation one would expect to see in a bullet that had struck bone.

¶ 17    Chicago Police Detective Steven Lazzara interviewed Tyson, Jones, and Knox following their arrests. He went with ASA Romano DiBennedetto to an address on South Burnside Avenue in an attempt to recover the firearm used in the shooting. Their efforts proved unsuccessful.

¶ 18    ASA Romano DiBennedetto spoke with Tyson while he was in custody on August 7, 2003. Tyson informed DiBennedetto he had tossed the handgun into a vacant lot following the murder. Tyson accompanied DiBennedetto and Lazzara to the lot to recover the firearm; however, they found no weapon. Following the trip to the vacant lot, DiBennedetto took a videotaped statement from Tyson, which was published for the jury.

¶ 19    In his videotaped statement, Tyson stated that Brown was with Jones and Knox. The three of them drove up to him in Brown's Impala. Brown was "kind of angry, asking for a gun so he can go back and shoot at somebody that had just shot at him." Brown told Tyson that the shooting was "over some females or something," and that he needed a firearm. Tyson told Brown that he might be able to help him and got in the Impala to go to 107th Street, where he knew a handgun was located. Tyson retrieved a "little black gun," which he gave to Brown. He also gave him a bulletproof vest which he had retrieved from the same place as the handgun.

¶ 20    Brown got in the back seat of his Impala with the vest and firearm, and Tyson drove the vehicle. Brown, Jones, and Knox gave Tyson directions back to 92nd Street and Cottage Grove Avenue. On 92nd Street, Tyson observed a person running around the corner, so he accelerated. Tyson heard shots as Brown "opened fire out the back window," and observed Brown shoot the

handgun that he had given him. Tyson sped away to 94th Street and Burnside Avenue, where he stopped the Impala. Brown jumped out of the Impala first, and Knox and Jones argued over who would take the weapon before also exiting the vehicle. The handgun was still in the backseat, so Tyson took the weapon and threw it into a vacant lot. After tossing the firearm, he was pulled over by police. Prior to recording his videotaped statement, Tyson took DiBennedetto and some detectives to the lot, but they found no handgun.

¶ 21    Tyson testified at trial that he was on 105th Street and Indiana Avenue around 2 a.m. on August 7, 2003, when he observed Brown, who was in his Impala with Jones and Knox. Brown was crying and said some people had shot at him. Brown was scared and wanted to go talk to the shooters, so Tyson got in the Impala and drove to 92nd Street and Cottage Grove Avenue. While driving, Tyson observed a man in a red shirt with a firearm in his hand running toward the Impala. Tyson heard shots fired and turned around to see Brown firing a handgun into the air.

¶ 22    On cross-examination, Tyson testified that his videotaped statement followed a script that was given to him by the police, who told him what to say so that the statements of all the witnesses would match. Tyson testified he agreed to follow the script because the police told him he would be permitted to leave, and would not be charged, if he cooperated. Specifically, the police told him to say that Brown was angry, Brown stated that he had been shot at over "some females," and Brown asked for a firearm to go back and shoot the people who shot at him. Further, the police instructed him to say everything in his statement pertaining to the handgun and bulletproof vest.

¶ 23    Tyson denied that they drove to 107th Street and that Brown asked him for a firearm to shoot the people who shot at him. He emphasized Brown only wanted to return to the area to speak with the shooters. Tyson did not see a handgun in the Impala when the three men jumped out, did

not toss it, and did not know what happened to it. He went over his statement with police for "a long time." He could not remember whether the ASA also told him what to say. When asked about his trip to the vacant lot with the ASA and police detectives, Tyson testified he "fooled" the ASA when he said he would show them where the handgun was located, and only said that because the police told him to say it. Tyson denied knowing where Brown obtained the weapon and maintained he did not observe it until Brown started shooting.

¶ 24    Tyson testified he first gave a statement to police shortly after his arrest, in which he denied that he gave Brown the weapon and stated he did not know about the handgun. At some point, his story to the police changed, based on the promises they made that he would be released. Tyson did not tell the police anything that he testified to at trial because the police gave him a script when he denied knowing anything about the firearm.

¶ 25    In rebuttal, Detective Lazzara testified he did not tell Tyson what to say after he was arrested and did not promise Tyson he would be released. He denied giving Tyson a script of what to say. Tyson took Lazzara to where he said he threw the handgun, and Lazzara did not tell him to say that to "fool" the ASA. Tyson never stated he observed Lewis with a handgun. Lazzara acknowledged Tyson initially stated he did not know where Brown got the firearm, but Tyson later changed his statement after Lazzara confronted him with the other witnesses' statements regarding where Brown obtained the firearm.

¶ 26    The jury found Tyson guilty of first degree murder based on a theory of accountability. The trial court sentenced Tyson to 30 years' imprisonment for first degree murder, with an added 15-year firearm enhancement, for an aggregate sentence of 45 years. We affirmed Tyson's

conviction on direct appeal. *People v. Brown*, Nos. 1-06-0034 and 1-06-0035 (cons.) (Dec. 9, 2009) (unpublished order pursuant to Illinois Supreme Court Rule 23).[4]

¶ 27    On March 2, 2011, Tyson filed an initial *pro se* postconviction petition pursuant to the Act, wherein he raised constitutional claims related to (1) the jury instructions issued at trial, (2) the police interrogation that led to his video statement, (3) prosecutorial misconduct, and (4) the ineffective assistance of appellate counsel for failing to raise various issues. Tyson attached to his petition a notarized affidavit from Brown, dated July 2012. In the affidavit, Brown averred (1) he was not present and had nothing to do with Lewis' murder; (2) he did not obtain a handgun from Tyson and his previous statements were "due to [his] mental health problems" and police coercion; and (3) he would testify to the aforementioned statements if he was called as a witness, "like [he] would have befor[e] [Tyson] went to trial but [he] was denied the opportunity by [Tyson's] trial attorney."

¶ 28    The circuit court summarily dismissed the petition on June 1, 2011. On appeal, this court remanded for further proceedings pursuant to an Agreed Motion for Summary Disposition because the circuit court did not rule on the petition within 90 days, as required by the Act. *People v. Tyson*, 1-11-1910 (July 31, 2012) (dispositional order).

¶ 29    On remand, the circuit court appointed postconviction counsel and docketed the petition for second stage proceedings. On October 25, 2017, counsel filed a supplemental petition, in support of Tyson's *pro se* petition, that incorporated Tyson's petition "by reference." The

---

[4]This court consolidated Tyson's direct appeal (No. 1-06-0035) with codefendant Brown's direct appeal (No. 1-06-0034). Pursuant to supervisory orders from our supreme court, this court vacated earlier decisions in the consolidated cases. See *People v. Brown*, Nos. 1-06-0034 and 1-06-0035 (cons.) (Sept. 25, 2008) (vacated May 12, 2009, pursuant to *People v. Brown*, Nos. 107422 (Jan. 28, 2009) and 107433 (Mar. 25, 2009)); *People v. Brown*, Nos. 1-06-0034 and 1-06-0035 (cons.) (May 14, 2009) (vacated Dec. 2, 2009, pursuant to *People v. Brown*, No. 108698 (Sept. 30, 2009)).

supplemental petition alleged, in relevant part, that Tyson was actually innocent and did not give Brown a firearm on the night in question.

¶ 30    Tyson attached to the supplemental petition a second notarized affidavit from Brown, dated March 2016. In that affidavit, Brown averred: (1) he told Tyson's trial attorney before trial that he wanted to testify for Tyson, but he was not called as a witness; (2) if called, he would have testified that Tyson did not give him a firearm, Tyson "did not have any information or knowledge that a crime was going to happen," and Tyson had nothing to do with the crime that occurred; (3) his statements to police about Tyson were forced and coerced by the police, and he did not feel well at the time; (4) at the time he made the statements, he was diagnosed with severe depression, which the detectives knew; (5) he had asked police for an attorney and was told he would be released if he said "certain things," and his trial attorney convinced him it was best to "stick to the story [he] said at the police station; and (6) "[t]he things that [he] said about [Tyson] were untrue."

¶ 31    On June 6, 2018, the State filed a motion to dismiss Tyson's petition and argued, *inter alia*, that Tyson's claim of actual innocence failed because Brown's affidavit did not qualify as newly discovered evidence and was "directly rebutted by evidence that came out at trial."

¶ 32    On June 26, 2019, the circuit court, in a written order, granted the State's motion to dismiss Tyson's petition. Tyson timely appealed.

¶ 33                              II. ANALYSIS

¶ 34    On appeal, Tyson argues his petition made a substantial showing of a constitutional violation by setting forth a claim of actual innocence supported by newly discovered evidence, in the form of Brown's second affidavit.

¶ 35    The Act provides for a three-stage process by which a defendant may assert his conviction was the result of a substantial denial of his constitutional rights. *People v. Beaman*, 229 Ill. 2d 56, 71 (2008). At the first stage, the trial court must review the postconviction petition and determine whether "the petition is frivolous or is patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2010). If the petition is not dismissed within 90 days at the first stage, counsel is appointed, and it advances to the second stage. 725 ILCS 5/122-2.1(a), (b) (West 2010).

¶ 36    This case involves the second stage of postconviction proceedings. At the second stage, the dismissal of a petition is warranted only when the allegations in the petition, liberally construed in light of the original trial record, fail to make a substantial showing of a constitutional violation. *People v. Hall*, 217 Ill. 2d 324, 334 (2005). At this stage, the trial court is "concerned merely with determining whether the petition's allegations sufficiently demonstrate a constitutional infirmity which would necessitate relief under the Act," (*People v. Coleman,* 183 Ill. 2d 366, 380 (1998)), and "all well-pleaded facts that are not positively rebutted by the trial record are to be taken as true." (*People v. Pendleton,* 223 Ill. 2d 458, 473 (2006)). The defendant "bears the burden of making a substantial showing of a constitutional violation." *Id.* We review the trial court's second stage dismissal of Tyson's postconviction petition *de novo*. *Id*.

¶ 37    The wrongful conviction of an innocent person violates due process under the Illinois Constitution and, thus, a freestanding claim of actual innocence is cognizable under the Act "and should be resolved as any other brought under the Act." See *People v. Washington*, 171 Ill. 2d 475, 489 (1996). To succeed on a claim of actual innocence, a petitioner must present evidence that is (1) newly discovered, (2) material and noncumulative, and (3) of such a conclusive character that

it would probably change the result on retrial. *People v. Coleman*, 2013 IL 113307, ¶ 96 (citing *Washington*, 171 Ill. 2d at 489).

¶ 38 Newly discovered evidence is evidence that was discovered after trial and could not have been discovered sooner through the exercise of due diligence. *People v. Robinson*, 2020 IL 123849, ¶ 47. Material evidence is evidence which is relevant and probative of the defendant's innocence. *Id*. Noncumulative evidence adds to the information that was presented to the fact finder at trial. *Id.* The conclusive character element refers to evidence that, when considered together with the trial evidence, would probably lead to a different result on retrial. *Robinson*, 2020 IL 123849, ¶ 47 (citing *Coleman*, 2013 IL 113307, ¶ 96). The conclusive character of the new evidence is the most important element of an actual innocence claim. *Id*.

¶ 39 Regarding the conclusive character element, ultimately, we ask "whether the evidence supporting the postconviction petition places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." *Robinson*, 2020 IL 123849, ¶ 49 (citing *Coleman*, 2013 IL 113307, ¶ 97). The new evidence is not required to be "entirely dispositive to be likely to alter the result on retrial." *Id.* "Probability, rather than certainty, is the key in considering whether the fact finder would reach a different result after considering the prior evidence along with the new evidence." *Id.*

¶ 40 Here, we find Tyson failed to make a substantial showing of a claim of actual innocence. Even assuming Brown's affidavits are newly discovered, material, and noncumulative, they are not of such a conclusive character that, "when considered along with the trial evidence," (*Robinson*, 2020 IL 123849, ¶ 49), they would probably change the result on retrial. See *Coleman*, 2013 IL 113307, ¶ 96. As set forth below, the overwhelming evidence at trial shows Tyson not

only gave Brown the handgun knowing he intended to seek revenge against the people who had initially shot at Brown's Impala, but Tyson also drove Brown to the scene to accomplish that revenge shooting. Even taking Brown's averments in the affidavits as true, as we must, they do not place this trial evidence in a different light or undermine confidence in the verdict.

¶ 41     At trial, both Jones and Knox testified that, following the shooting directed at Brown's Impala, they encountered Tyson, who thereafter entered the Impala. Brown told Tyson that someone shot at his vehicle. Jones testified that Brown wanted to go back to the scene because "they shot at his car" and he was going to shoot at "them." He also acknowledged that he testified before the grand jury that Brown asked Tyson for a handgun because he wanted to exact revenge. Both Jones's and Knox's testimonies established the four men proceeded to 107th Street and Indiana Avenue, where Tyson exited the Impala and returned with a firearm and bulletproof vest. Tyson gave these items to Brown, who then used the firearm to shoot Lewis after Tyson drove the Impala back to the scene of the initial shooting. Knox's grand jury testimony was admitted and showed that the men discussed who would be the shooter, and Brown volunteered.

¶ 42     This evidence corroborated Tyson's videotaped statement, in which he acknowledged that he gave Brown the handgun, drove Brown back to the area of the first shooting, and later attempted to discard the weapon following the shooting of Lewis. In his statement, Tyson also admitted that Brown was angry when he approached Tyson on 105th Street and requested a handgun to retaliate against the people who had shot at his vehicle. Tyson then provided a handgun to Brown. See *People v. Simpson*, 2015 IL 116512, ¶ 36 ("It has been observed that 'a confession is the most powerful piece of evidence the State can offer, and its effect on a jury is incalculable.' " (quoting *People v. R.C.*, 108 Ill. 2d 349, 356 (1985)). Although Tyson later claimed his statement

was fabricated and coerced by police, we note the trial court denied his motion to suppress his statement prior to trial. Jones's and Knox's testimonies also corroborated Tyson's testimony that he got in the Impala with Brown, drove to where Brown said shots had been fired at him, and then observed Brown firing the weapon.

¶ 43     Given this evidence, Brown's varying inconsistent averments are not of such a conclusive character that they would probably change the guilty findings on retrial if he were to testify. See *e.g.*, *People v. Collins*, 2021 IL App (1st) 170597, ¶¶ 58-60 (affidavit offering "scant details of the crime and fail[ing] to admit any responsibility in the murder" is a " 'benign gesture' " and lacked conclusive character necessary to change result on remand (quoting *People v. Jones*, 399 Ill. App. 3d 341, 366 (2010)). In Brown's first affidavit, which was incorporated into Tyson's supplemental petition by reference, Brown averred he was not present at the scene, had nothing to do with Lewis's shooting, and did not receive a handgun from Tyson. In his second affidavit, he averred Tyson did not give him a handgun, did not know a crime was about to occur, and had nothing to do with that crime. As an initial matter, it is unclear how Brown could know Tyson had nothing to do with the shooting if Brown himself was not there. Further, not only do Brown's averments conflict with Knox's and Jones's testimonies, but they also conflict with Tyson's own testimony, which placed Brown in the vehicle shooting the firearm. Where, as here, the newly discovered evidence merely adds conflicting evidence to the evidence presented at trial and is not of such a conclusive character that it would probably change the result on retrial, it is insufficient to satisfy the substantial showing requirement to advance the postconviction petition to third stage proceedings. See *Robinson*, 2020 IL 123849, ¶ 58 (citing *People v. Sanders*, 2016 IL 118123, ¶¶ 48, 52, 55 (finding at second stage proceedings that, where the new evidence merely added

- 15 -

"conflicting evidence to the evidence adduced at trial," the new evidence was not of such conclusive character as would change the result on retrial)).

¶ 44                              III. CONCLUSION

¶ 45     Accordingly, we find Tyson has failed to make a substantial showing of a claim of actual innocence and his petition was therefore properly dismissed at second stage proceedings.

¶ 46     Affirmed.