No. 2-21-0143
Order filed October 3, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Kane County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 07-CF-1821 |
| | ) | |
| MICHAEL J. REYES, | ) | Honorable |
| | ) | Charles E. Petersen, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE SCHOSTOK delivered the judgment of the court.
Justices Hutchinson and Birkett concurred in the judgment.

**ORDER**

¶ 1    *Held*: The second-stage dismissal of the defendant's postconviction petition is affirmed on the defendant's claims related to actual innocence and juror bias. The dismissal of the defendant's claim that defense counsel was ineffective in failing to call alibi witnesses to testify at trial is reversed and remanded for an evidentiary hearing.

¶ 2    The defendant, Michael Reyes, appeals the order of the circuit court of Kane County dismissing his postconviction petition under the Post-Conviction Hearing Act (Act) (720 ILCS 5/122-1 *et seq.* (West 2014)) without an evidentiary hearing. The defendant argues that he made a substantial showing of actual innocence, ineffective assistance of counsel, and that he was denied

his right to an impartial jury. We affirm in part, reverse in part, and remand for additional proceedings.

¶ 3                                         I. BACKGROUND

¶ 4      The facts are set forth in detail in our decision on direct appeal. See *People v. Reyes*, 2015 IL App (2d) 130832-U. We set forth here only those facts necessary to place into context the issues raised in the defendant's postconviction appeal. All additional facts necessary to resolve the arguments raised on appeal will be discussed in conjunction with the particular alleged basis for reversal.

¶ 5      On March 9, 1993, two brothers, Jesus and Francisco Montoya, were found murdered in a van parked on a residential street in Aurora. The men were in the back of the van and had bullet wounds to their heads. However, neither was shot between the eyes, or in his throat or neck. Four .45 caliber shell cases were found inside the van.

¶ 6      In 1993, a coworker of the defendant, Dennis Sorbel, gave a statement to the police that implicated the defendant in the murders. The defendant's home was searched the next day and the defendant voluntarily spoke to police. However, the defendant was not charged with the murders of the Montoya brothers until 2007. A jury trial was held between January 28 and February 1, 2013. The following evidence was presented.

¶ 7      Jesus's girlfriend testified that in 1993 the brothers were involved in selling cocaine for their family, who obtained it from an uncle in Texas.

¶ 8      Sorbel testified that, in 1993, he and the defendant were both employees at the same manufacturing plant in Aurora. On March 10, 1993, while eating lunch together at a Pizza Hut near work, the defendant told Sorbel that he had murdered two brothers as part of a "ripoff" involving $60,000 worth of drugs. The defendant said he used a .45 caliber gun and that he shot

one of the brothers in the neck. The defendant took the brothers' cocaine. The defendant told Sorbel that his mother and girlfriend would provide an alibi. Sorbel told a friend in Colorado that one of the victims had been shot in the forehead, between the eyes.

¶ 9    Former FBI agent Paul Bock testified that he worked on an investigation into drug trafficking by members of the Latin Kings street gang in Aurora in late 2001. A large number of gang members were arrested and charged, and many offered to cooperate with the government's efforts to prosecute other gang members in exchange for cash, relocation, or favorable plea agreements in their own cases. Among other efforts, the FBI worked with the county sheriff and county prosecutor to reexamine unsolved murders, including the murders of the Montoya brothers.

¶ 10    The following people were involved with the FBI's gang-related investigations and received concessions in exchange for their testimony. Jose Oliva testified that in the spring of 1993, the defendant asked him for a gun and Oliva gave him a .45 caliber handgun. Juan Acevedo testified that he had been a Latin King in Aurora from 1988 through about 2004. In October 2002, the defendant told Acevedo that he and Abraham Estremera had murdered the Montoya brothers. Carlos Olivares testified that the defendant told him that he had used a .45 caliber handgun to kill the Montoya brothers and that he took nine ounces of cocaine from the brothers. Carlos Escalante testified that the defendant told him that he had killed the Montoya brothers. The defendant said that he arranged to buy cocaine from them, met with them inside a van, and shot them. Michael Rodriguez testified that, while he was in jail in 2007, he shared a cell with the defendant. At some point during that time, the defendant volunteered that he had killed the Montoya brothers. The defendant said Estremera was with him. The defendant first shot one brother, who was in the driver's seat; then he shot the other brother, who was a passenger. The defendant split the nine ounces of cocaine they took from the brothers with Estremera.

¶ 11    Craig Renzelmen testified that he shared a jail cell with the defendant in July 2008. Renzelman said that the defendant spoke about the Montoya brothers' shooting "mostly every day." The defendant recounted how he and someone named Abraham shot the brothers so they could steal drugs from them. On cross-examination, Renzelman admitted that he was hoping his testimony might persuade officials to help him with the charges for which he was incarcerated.

¶ 12    Finally, Gino Montoya testified that he was the victims' younger brother. On the night in question his brothers left the house with nine ounces of cocaine and were planning to meet the defendant and some other individuals. He did not tell the police until September 2012 because his mother was afraid that he would be a victim of retaliation. Gino conceded that his mother had arranged for him to talk with police in 1993 and he did not tell the police what he knew at that time.

¶ 13    Following trial, the jury found the defendant guilty of three counts of first-degree murder (720 ILCS 5/9-1(a)(1)-(a)(3) (West 1992)) as to each brother, for a total of six convictions. Following the denial of his posttrial motion and the reconsideration of his sentence, the defendant was sentenced to natural life in prison, to run concurrently to other sentences the defendant was serving. On direct appeal, this court affirmed the defendant's conviction and sentence. *People v. Reyes*, 2015 IL App (2d) 130832-U.

¶ 14    On November 30, 2015, the defendant filed a postconviction petition. The defendant alleged that during postconviction investigation, former Aurora police officer, Reynaldo Rodriguez, provided an affidavit, dated November 25, 2015, which was attached to the petition. The defendant also attached a March 13, 1993, police report written by Rodriguez. The defendant argued that the affidavit and report established his actual innocence.

¶ 15    Rodriguez's 2015 affidavit stated that, in March 1993, he was employed as a patrol officer. At about 2:30 a.m. on March 9, 1993, Rodriguez was assisting with a traffic stop when he drove to the intersection of Spencer Street and Downer Place, in Aurora.  As he turned onto Spencer Street, he saw two men near a white and gold van.  He could identify and describe the men because he put his spotlight on them.  One of the men, who he "got a good look at," walked from the passenger side to the front of the van.  The man was about 5 feet 8 inches tall and weighed approximately 150 pounds.  He had black hair and was wearing a black cap, a black and white or black and silver hooded jacket, black pants, and tennis shoes.  Another man, who Rodriguez "did not get as good of a look at," walked from the passenger side to the rear of the van.  That man was about 5'9" tall and weighed approximately 180 pounds.  As Rodriguez was driving, he saw the men run across the street.  He drove around the block and when he came back the men were gone and the van was still parked on Spencer street.  Rodriguez then left the area.  He wrote two police reports about what he saw that night near the van.  Years later, Rodriguez was shown a photo array of suspects involved in the Montoya murders.  The defendant's picture was in that photo array. Rodriguez did not see either of the two men he saw on the night of the murders in the photo array. When the defendant was preparing to go to trial, the defendant's lawyers tried to speak with Rodriguez about what he saw the night of the murders, but due to symptoms of unmedicated post-traumatic stress disorder, Rodriguez was unable to speak about his observations.  However, at the time of his affidavit, Rodriguez attested he was taking medication and would be able to testify about his observations near the van on the night of the murders.

¶ 16    In his March 1993 police report, Rodriguez stated that on March 9, 1993, at about 3:00 to 3:45 a.m., he observed a brown and white van on Spencer Street near Downer Place.  The police report described how Rodriguez observed two men near the van.  The description was the same as

set forth in his 2015 affidavit. He stated that he did not see anyone sitting in the front seats of the van so he left the area. Rodriguez's report indicated that he was in the area because he was assisting another officer with a traffic stop nearby. At about 2:30 to 3 a.m., while he was assisting, he heard a radio call of shots fired in the area where he later observed the two men near the van. A squad was dispatched to where the shots were heard and an officer replied that it was just a vehicle back firing.

¶ 17 Based on Rodriguez's affidavit and police report, the defendant raised a claim of actual innocence, arguing that since Rodriguez did not identify the defendant as one of the men he saw near the van on the night of the murders, the defendant was innocent. The defendant acknowledged that for a claim of actual innocence he needed to present evidence that was new, material, noncumulative, and which would probably change the result on retrial. The defendant argued that the evidence was new because Rodriguez's mental condition prevented him from relaying the information to defense counsel and the jury at the time of trial. It was material and noncumulative because no one else saw the offenders on the night of the murders. Finally, it would likely change the result on retrial because there was no direct evidence of the defendant's guilt and the State's case at trial was largely based on testimony from informants who received concessions in exchange for their cooperation with the State.

¶ 18 Although not referenced in his postconviction petition, the record also contains a September 13, 2000, report that was written by Rodriguez after he viewed the photo arrays. Rodriguez indicated that he chose two photos from the arrays. He stated that one of the photos, showing a person with a mustache and goatee, was "similar" to one of the people he observed and that the other photo was of a person with the same approximate age and build of the person he saw

walking away from the front of the van. He further stated that he was not 100% sure either of the people he identified in the photos were the men he observed walking away from the van.

¶ 19    As an alternative to his claim for actual innocence, the defendant argued that defense counsel was ineffective in failing to call Rodriguez to testify at trial because Rodriguez would have presented exculpatory testimony to the jury.

¶ 20    On December 17, 2018, the defendant filed a supplemental petition. The defendant argued that defense counsel was ineffective in failing to interview and present alibi witnesses at the defendant's trial. The defendant also argued that he was deprived of his right to trial by an impartial jury where it appeared that one of the jurors knew the victims' family.

¶ 21    The defendant attached affidavits from the defendant's mother, Teresa Martinez, and two sisters, Danielle Reyes and Raquel Martinez. In those affidavits, Teresa and Danielle stated that, at the time of the Montoya murders, they lived in the same house with the defendant. On the night of the murders, the defendant was at home all day and evening and never left the house. They stated that they repeatedly tried to give this information to defense counsel but defense counsel never had time to speak with them. They stated that they were at the trial every day and could have provided alibi testimony on behalf of the defendant.

¶ 22    The affidavits of Danielle and Raquel indicated that, on the first day of trial, they saw one of the jurors wave to Noelia Morales when she entered the courtroom. Morales was the mother of one of the victim's children, and she was on the witness list. The affiants indicated that the juror was excited to see Morales and waved. In response, Morales nodded and smiled. Raquel stated that the juror was a white woman with long, highlighted, blond hair. Raquel indicated that she informed defense counsel of the exchange. Defense counsel acknowledged the information but they never spoke about it again. Danielle also attested that the same juror gestured to the victims'

family in the courthouse hallway and that the family acknowledged the juror. Finally, Danielle attested that, on the day that the defendant was found guilty, she saw the same juror hug Morales in the courthouse parking lot.

¶ 23    On September 16, 2019, the State filed a motion to dismiss the defendant's postconviction petition. The State argued that defense counsel was not ineffective in failing to call Teresa and Danielle as alibi witnesses because the decision of what witnesses to call is a matter of trial strategy. The State also argued that the defendant had not made a substantial showing that he was denied the right to an impartial jury. The State noted that, during *voir dire*, all the jurors stated that they could be fair and impartial and would render a verdict solely based on the evidence presented.

¶ 24    The State also argued that the defendant failed to establish a claim of actual innocence. The State asserted that Rodriguez's affidavit did not present any newly discovered evidence because Rodriguez's reports were in the possession of the defendant prior to trial. Further, Rodriguez was listed as a possible witness and under subpoena to appear at trial. The State noted that, at the start of trial, defense counsel filed a motion *in limine* to bar evidence that Rodriguez was discharged from the police department because of a record of untruthfulness. The State asserted that defense counsel made a strategic decision not to call Rodriguez to testify after the trial court denied the motion *in limine*. The State also argued that Rodriguez's affidavit was not of such a conclusive character that it would have changed the result on retrial.

¶ 25    On February 17, 2021, following a hearing, the trial court entered a written ruling. The trial court found that it was sound trial strategy not to call Teresa and Danielle as alibi witnesses since they were family members and the affidavits did not specifically indicate that they laid eyes on the defendant in the house on the night of the murders. The trial court also found that

Rodriguez's affidavit did not support a claim of actual innocence because it was not newly discovered, material, noncumulative, and would not be conclusive on retrial. The trial court noted that Rodriguez was subpoenaed to appear at trial and found that defense counsel made a strategic decision not to call him to testify because his employment records indicated that he was terminated from the police department for being untruthful. Finally, the trial court noted that, during *voir dire*, the jurors were asked whether they could be fair and impartial and whether they knew the victim, defendant, or any of the witnesses. The trial court found that there was no evidence that the jurors lied or showed prejudice against the defendant. Based on the foregoing, the trial court determined that the defendant failed to make a substantial showing of a constitutional violation and thus granted the State's motion to dismiss the defendant's petition. This timely appeal followed.

¶ 26                                 II. ANALYSIS

¶ 27    The defendant's first contention on appeal is that the trial court erred in dismissing his postconviction petition because he made a substantial showing of actual innocence. Specifically, the defendant argues that Rodriguez's affidavit established that Rodriguez saw the offenders near the van where the murders occurred and that the defendant was not one of the people he saw.

¶ 28    The Act allows criminal petitioners to collaterally attack a prior conviction and sentence where there was a substantial violation of his or her constitutional rights. *People v. Gosier*, 205 Ill. 2d 198, 203 (2001). In order for a petitioner to successfully challenge a conviction or sentence pursuant to the statute, he or she must demonstrate that there was a substantial deprivation of federal or state constitutional rights. *People v. Morgan*, 187 Ill. 2d 500, 528 (1999).

¶ 29    The Act sets forth three stages of review. At the first stage, the trial court may summarily dismiss a postconviction petition as frivolous and patently without merit. 725 ILCS 5/122-2.1(a)(2) (West 2018). If the petition is not dismissed, it advances to the second stage.

¶ 30    At the second stage, the defendant is appointed counsel, who must consult with the defendant, examine the record, and amend the petition as necessary to ensure that the defendant's contentions are adequately presented. *People v. Gerow*, 388 Ill. App. 3d 524, 526 (2009). The State may then move to dismiss the petition. *Id.* In considering such a motion to dismiss, the trial court must take as true " 'all well-pleaded facts that are not positively rebutted by the trial record.' " *Id.* (quoting *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006)). Applying this lens, the trial court must determine whether the petition and the accompanying documentation make a " 'substantial showing of a constitutional violation.' " *People v. Domagala*, 2013 IL 113688, ¶ 33 (quoting *People v. Edwards*, 197 Ill. 2d 239, 246 (2001)). A substantial showing of a constitutional violation "is a measure of the legal sufficiency of the petition's well-pled allegations of a constitutional violation, *which if proven* at an evidentiary hearing, would entitle petitioner to relief." (Emphasis in original.) *Id.* ¶ 35.

¶ 31    If the motion to dismiss is denied, the State must answer the petition and the proceeding moves to the third stage for an evidentiary hearing at which the trial court acts as the fact finder and determines whether the evidence introduced demonstrates that the defendant is entitled to relief. 725 ILCS 5/122-5 (West 2018). The defendant argues that he met the substantial-showing standard and his petition should have advanced to the third stage. We review *de novo* the dismissal of a postconviction petition. *People v. Coleman*, 183 Ill. 2d 366, 385 (1998).

¶ 32    The conviction of an innocent person violates the due process clause of the Illinois Constitution (Ill. Const.1970, art. I, § 2). *People v. Morgan*, 212 Ill. 2d 148, 154 (2004). Therefore, a person may assert in a postconviction proceeding a freestanding claim of actual innocence based on newly discovered evidence. *Id.* To succeed on a claim of actual innocence, the petitioner must present new, material, noncumulative evidence that is so conclusive it would

probably change the result on retrial. *People v. Coleman*, 2013 IL 113307, ¶ 96. New evidence means the evidence was discovered after trial and could not have been discovered earlier through the exercise of due diligence. *Id.* Material evidence is evidence that is relevant and probative of the defendant's innocence. *Id.* Noncumulative means the evidence adds to information that the jury heard during trial. *Id.* "And conclusive means the evidence, when considered along with the trial evidence, would probably lead to a different result." *Id.*

¶ 33    The last of these elements—*i.e.*, that the evidence is of such conclusive character that it would probably change the result on retrial—is the most important element of an actual-innocence claim. *People v. Washington*, 171 Ill. 2d 475, 489 (1996). "[T]he hallmark of actual innocence means total vindication, or exoneration." (Internal quotation marks omitted.) *People v. Collier*, 387 Ill. App. 3d 630, 636 (2008). In determining whether the evidence is so conclusive as to probably change the result on retrial, the court must engage in a balancing test of the evidence before it. *Coleman*, 2013 IL 113307, ¶ 97.

¶ 34    In the present case, the defendant failed to make a substantial showing of a claim of actual innocence. First, the information provided by Rodriguez in his affidavit was not new. It was substantially the same information contained in his March 1993 police report. The record shows that in a July 25, 2012, motion for additional discovery, the defendant acknowledged receipt of Rodriguez's March 1993 police report and a later report, dated September 13, 2000, in which Rodriguez described viewing photo lineups. Further, at a September 25, 2012, hearing on a motion to dismiss the defendant's indictment, defense counsel acknowledged the existence of Rodriguez's March 1993 and September 2000 reports. The record also shows that Rodriguez was under subpoena and was included on a witness list that was filed prior to trial.

¶ 35    The defendant argues that the evidence is newly discovered because its presentation was impeded by an outside factor—Rodriguez's mental condition, which prevented him from relaying this evidence to defense counsel and a jury. In support of this contention, the defendant cites *People v Ortiz*, 235 Ill. 2d 319 (2009). In *Ortiz*, the defendant was convicted of murdering someone in a park. *Id.* at 322. Ten years after the offense, an eyewitness to the murder provided an affidavit stating that the defendant was not involved in the shooting of the victim. *Id.* at 334. In finding that the affidavit constituted newly discovered evidence, our supreme court noted the affiant alleged he was in an area of the park "where he would not have been seen by [the] defendant ***." *Id.* The *Ortiz* court further noted the affiant "essentially made himself unavailable as a witness" by fleeing to Wisconsin shortly after the murder. *Id.* Based on these two factors—the witness being (1) unknown to the defendant and (2) unavailable due to his flight to another jurisdiction—our supreme court concluded the affidavit constituted newly discovered evidence. *Id.*

¶ 36    The defendant's reliance on *Ortiz* is unpersuasive. Unlike in *Ortiz*, where the defendant had no way of knowing that the affiant witnessed the murder and the affiant fled to another jurisdiction, the defendant in the present case was aware of Rodriguez's police reports and his observations of the two men near the van on the night of the murders. Further, Rodriguez was on the witness list and subpoenaed for trial. Rodriguez's affidavit does not state that he would have refused to testify if called at trial. Moreover, even assuming that Rodriguez's had a mental condition that would have prevented him from testifying at trial, this does not mean his affidavit is newly discovered evidence. *People v. Jones*, 399 Ill. App. 3d 341, 364 (2010) ("evidence is not newly discovered when it presents facts already known to a defendant at or prior to trial, though the source of those facts may have been unknown, unavailable or uncooperative.").

¶ 37    In addition to Rodriguez's affidavit not constituting newly discovered evidence, the content of the affidavit is not so conclusive that it would probably change the result on retrial. While Rodriguez stated in his affidavit that he had a good look at one of the men near the van, he also stated that he did not get a good look at the second man. The second man was described only as being 5' 9" and about 180 pounds. A June 20, 2007, police report contained in the record, and marked as Defendant's Exhibit 3, stated that the defendant was 5 feet 9 inches and 170 pounds. It is possible, therefore, that the defendant was one of the men Rodriguez saw near the van on the evening of the murders. We acknowledge that, in his affidavit, Rodriguez stated that the defendant's picture was included in one of the photo arrays he viewed years later and that he did not identify the defendant as one of the men he saw. However, in his September 2000 report, Rodriguez stated that he was not sure whether either of the two men he chose from the photo arrays were the men he saw near the van on the night of the murders. Accordingly, Rodriguez's affidavit and reports are not conclusive of the defendant's guilt or innocence.

¶ 38    The defendant's next contention on appeal is that defense counsel was ineffective in failing to call Rodriguez to testify at trial as he could have provided exculpatory evidence. The defendant argues that he was prejudiced because there was no direct evidence of his guilt and the case against him was based almost entirely on the testimony of informants who received benefits in exchange for their testimony.

¶ 39    Under *Strickland v. Washington*, 466 U.S. 668 (1984), a defendant arguing ineffective assistance of counsel must show not only that his or her counsel's performance was deficient but also that the defendant suffered prejudice as a result. *People v. Houston*, 226 Ill. 2d 135, 143 (2007). Specifically, under the two-prong *Strickland* test, "a defendant must show that (1) his counsel's performance *** fell below an objective standard of reasonableness, and (2) *** but for

counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different." *Id*. at 144. Because a defendant must satisfy both prongs of the *Strickland* test, the failure to establish either is fatal to the claim. *Strickland*, 466 U.S. at 687.

¶ 40 To satisfy the deficient performance prong of *Strickland*, a defendant must show that his counsel's performance was so inadequate "that counsel was not functioning as the 'counsel' guaranteed by the sixth amendment" and, also, must overcome the strong presumption that any challenged action or inaction may have been the product of sound trial strategy. *People v. Evans*, 186 Ill. 2d 83, 93 (1999). Decisions concerning which witnesses to call at trial and what evidence to present on a defendant's behalf are considered matters of trial strategy and are generally immune from claims of ineffective assistance of counsel. *People v. Wilborn*, 2011 IL App (1st) 092802, ¶ 79. If a defendant can establish that counsel's performance was deficient, the second prong requires the defendant to show that he was prejudiced as a result. *People v. Dupree*, 2018 IL 122307, ¶ 44. "That is, a defendant must show that counsel's deficiency was so serious that it deprived him of a fair trial." *Id.*

¶ 41 In the present case, the defendant has failed to make a substantial showing that defense counsel was ineffective in failing to call Rodriguez to testify at trial. The record indicates that Rodriguez was on the witness list and subpoenaed for trial. Prior to trial, defense counsel filed a motion to bar any evidence related to Rodriguez's personnel file or the reasons why he was terminated from the police department. The trial court denied the motion, finding that, because one of the reasons for Rodriguez's termination had to do with truthfulness, it was open for cross-examination. As such, if Rodriguez had been called to testify, he could have been impeached with evidence that he was terminated from the police department based on being untruthful. Accordingly, the defendant has failed to overcome the strong presumption that defense counsel

strategically decided not to call Rodriguez to testify at trial because of the reason for his termination from the police department. In addition, the defendant has failed to make a substantial showing that he was prejudiced by the failure to call Rodriguez to testify. As explained above, Rodriguez's affidavit and police reports are not conclusive as to the defendant's guilt or innocence. As the defendant fails to meet both prongs of *Strickland*, the trial court properly dismissed his claim of ineffective assistance of counsel without an evidentiary hearing.

¶ 42 The defendant's third contention on appeal is that he made a substantial showing that defense counsel was ineffective in failing to present alibi witnesses. Teresa and Danielle both provided affidavits stating that, at the time of the offense, they lived with the defendant and that, on the day of the murders, he was at home all day and night. They also stated that they attempted to speak with defense counsel about the alibi, but defense counsel ignored their requests.

¶ 43 As noted above, decisions concerning which witnesses to call at trial and what evidence to present are matters of trial strategy that are generally immune from claims of ineffective assistance of counsel. *Wilborn*, 2011 IL App (1st) 092802, ¶ 79. Nonetheless, defense counsel has a professional duty to conduct reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. *Domagala*, 2013 IL 113688, ¶ 38. The failure to interview witnesses may be indicative of deficient representation when the witnesses are known to trial counsel and their testimony may be exonerating or support an otherwise uncorroborated defense. *Coleman*, 183 Ill. 2d at 398; *People v. Tate*, 305 Ill. App. 3d 607, 612 (1999).

¶ 44 The defendant relies on *Tate* in arguing that he is entitled to an evidentiary hearing on his claim. In *Tate*, following a jury trial, the defendant was convicted of murder. *Id.* at 608. The defendant filed a postconviction petition alleging counsel was ineffective in failing to call certain alibi witnesses whose affidavits indicated that the defendant could not have been present at the

scene of the crime. *Id.* at 610. The trial court granted the State's motion to dismiss. *Id.* On appeal, the reviewing court reversed and remanded for an evidentiary hearing. The reviewing court noted that the defense strategy at trial was to draw attention to the weaknesses in the State's evidence that identified the defendant as the offender. *Id.* at 612. The reviewing court concluded that since the affidavits supported the defense theory that the defendant was misidentified, there was no apparent strategic reason not to call the alibi witnesses to testify. *Id.* The reviewing court acknowledged that defense counsel may have determined that the witnesses would not be credible or would not be persuasive due to their close relationship with the defendant, but that it could not say as a matter of law that that was defense counsel's reasoning. *Id.*

¶ 45    We find the defendant's reliance on *Tate* to be persuasive. In the present case, the defendant has also made a substantial showing that defense counsel was ineffective in failing to present the alibi witnesses. The defense theory at trial was that the defendant was innocent and the State's witnesses were not credible as the majority of them were cooperating with the State to secure benefits for themselves, such as monetary payments and reduced sentences for their own crimes. As in *Tate*, the affidavits of Teresa and Danielle, taken as true at this stage in the proceedings (*Gerow*, 388 Ill. App. 3d at 526), would have supported the defense as an alibi would have further tested the credibility of the State's witnesses. The record simply does not reflect that defense counsel made a strategic decision not to call the alibi witnesses, as there was no apparent reason not to do so. Further, in the absence of any physical evidence linking defendant to the crime scene and if the alibi witnesses were deemed credible, we cannot say that there is no reasonable probability that the result of the trial would have been different. Accordingly, the defendant is entitled to an evidentiary hearing on this claim. *Tate*, 305 Ill. App. 3d at 612.

¶ 46    In so ruling, we note that the State argues that the affidavits are unhelpful because the affiants did not specifically state that they saw the defendant in the home on the night of the murders. We find this argument unpersuasive because the natural inference from the affidavits is that Teresa and Danielle had a basis to believe that the defendant was at home that evening. The basis for their belief, such as whether they saw him or heard him at home on the night in question, is a matter that can be assessed at an evidentiary hearing. The State also asserts that defense counsel indicated an intent to assert the defense of alibi and that the failure to do so must have therefore been a strategic decision. The State cites to "Respondent's Exhibit 6" as showing defense counsel's alleged intent to assert an alibi defense. However, that exhibit could not be found in the record.

¶ 47    We also note that the State relies on *People v. Williams*, 2017 IL App (1st) 152021, in arguing that the dismissal of this claim should be affirmed. In *Williams*, the defendant was convicted of murder based mostly on the testimony of witnesses who received concessions in exchange for their testimony. *Id.* ¶¶ 6-8. In a postconviction petition, the defendant alleged that trial counsel was ineffective in failing to interview and call alibi witnesses. *Id.* ¶ 9. The trial court granted the State's motion to dismiss the petition. *Id.* On appeal, the reviewing court reversed the second-stage dismissal of the claim and remanded for an evidentiary hearing. *Id.* ¶ 10 (citing *People v. Williams*, 2013 IL App (1st) 110304-U, ¶¶ 17, 20). At the evidentiary hearing, the alibi witnesses provided testimony regarding the alleged alibi. *Id.* ¶¶ 11-13. Following the testimony, the trial court granted the State's motion for a directed finding. The trial court found that the alibi witnesses were not credible, that trial counsel made a strategic decision not to present the alibi testimony, and that there was no reasonable probability that the alibi testimony would have changed the result at trial. *Id.* ¶ 15. On appeal, the defendant argued that the trial court erred in

denying him postconviction relief. *Id.* ¶ 35. The reviewing court affirmed the trial court's determination, holding that the trial court's determination was not against the manifest weight of the evidence. *Id.* ¶¶ 39-42.

¶ 48 We find the State's reliance on *Williams* misplaced as it actually supports our determination in the present case. In this case, as in *Williams*, the evidence against the defendant was largely based on testimony of witnesses who received concessions in exchange for their testimony. Though the *Williams* court affirmed the dismissal of the defendant's postconviction claim, it was only after an evidentiary hearing was held where the trial court could assess the credibility of the alibi testimony, whether trial counsel made a strategic decision not to call the alibi witnesses, and whether the lack of alibi testimony was prejudicial to the defendant. In this case, as in *Williams*, the defendant is entitled to an evidentiary hearing.

¶ 49 The defendant's final contention on appeal is that he made a substantial showing that he was denied his right to an impartial trial where it appeared that one juror knew the victim's family or at least one member of the victim's family. In relation to that argument, the defendant also argues that the trial court erred in denying his request for postconviction discovery concerning the identity of the jurors.

¶ 50 The federal and Illinois constitutions guarantee the right to a fair trial by an impartial jury. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. 1, §§ 8, 13. Trial before a biased jury would deprive a defendant of a substantial right and constitute an error requiring reversal. *People v. Runge*, 234 Ill. 2d 68, 102 (2009). A jury is biased when "it reasonably appears that at least some of the jurors have been influenced or prejudiced so that they cannot be fair and impartial." *People v. Thomas*, 296 Ill. App. 3d 489, 500 (1998). The challenging party bears the burden of showing

that a juror has a "disqualifying state of mind," and mere suspicion of partiality is not sufficient. *Id.*

¶ 51    In the present case, the defendant has failed to make a substantial showing that he was denied his right to a fair and impartial jury. The allegation in his postconviction petition is that one of the jurors was an acquaintance of the victim's family. The affidavits in support of this assertion indicate that, on the first day testimony was taken at trial, one of the jurors waved at Morales, that the same juror gestured to the victims' family in the courthouse hallway, and that the juror hugged Morales in the parking lot after the conclusion of trial. To make a substantial showing of a constitutional violation, there must be allegations that, if proven at an evidentiary hearing, would entitle the petitioner to relief. *Domagala*, 2013 IL 113688, ¶ 35. Here, even if these allegations were proven to be true, they do not establish that the juror at issue was not impartial. During *voir dire*, the names of all the witnesses were read, including the name of Morales, and none of the jurors indicated that they knew her. In addition, all the jurors acknowledged that the defendant was innocent until proven guilty, that they would decide the case solely based on the facts heard in the courtroom, and that they could be fair and impartial to both sides. The fact that a juror may have recognized Morales upon seeing her does not establish juror bias. See, *e.g.*, *People v. Porter*, 111 Ill. 2d 386, 404 (1986) (fact that juror and victim's mother attended the same church was insufficient to show juror bias); *People v. Strawbridge*, 404 Ill. App. 3d 460, 467 (2010) (fact that juror had recognized the victim when the victim testified was not sufficient to establish that juror could not be impartial).

¶ 52    In arguing that he is entitled to an evidentiary hearing, the defendant relies on *People v. Hobley*, 182 Ill. 2d 404 (1998). In *Hobley*, the defendant was convicted of murder and arson and sentenced to death. *Id.* at 410. The defendant filed a postconviction petition alleging, in part, that

he was deprived of his right to a fair and impartial jury. *Id.* at 457. The trial court granted the State's motion to dismiss his postconviction petition. *Id.* at 427. Our supreme court reversed and held that the allegations in the petition warranted an evidentiary hearing. *Id.* at 459. The allegations, supported by affidavit, were that when several jurors were dining in a hotel restaurant where they were sequestered, several men made comments to the effect that "you know he's guilty," and "give him the death penalty." One man yelled out "Hang the m***." The affidavits indicated that the comments made some jurors upset, scared, and shaken. *Id.* In making its determination, our supreme court noted that communications between jurors and third parties are presumptively prejudicial. *Id.* at 462.

¶ 53 The defendant's reliance on *Hobley* is unpersuasive. An evidentiary hearing was warranted in *Hobley* where there were allegations of presumptively prejudicial jury communications and the supporting affidavits indicated that the communications had affected the jury. In this case, unlike in *Hobley*, there was no allegation of direct communication between the juror and any third party. There only allegations of friendly gestures and a hug following a murder trial. These allegations are not sufficient to establish that there was any type of relationship that would support a conclusion of juror bias. See *People v. Williams*, 209 Ill. 2d 227, 241-42 (2004) (mere assertion of improper juror conversation did not warrant evidentiary hearing when there were no allegations establishing that the improper conversation was prejudicial).

¶ 54 In a related argument, the defendant contends that the trial court erred in denying his motion for postconviction discovery. Neither criminal nor civil discovery rules apply to proceedings under the Act. *People v. Fair*, 193 Ill. 2d 256, 264 (2000). Nonetheless, a trial court has inherent discretionary authority to order discovery in postconviction proceedings. *People v. Johnson*, 205 Ill. 2d 381, 408 (2002). Trial courts should exercise this authority with caution and should only

allow discovery if the moving party demonstrates "good cause" for a discovery request. *Fair*, 193 Ill. 2d at 264-65. In determining whether a petition has made such a showing, the trial court should consider, among other relevant circumstances, the issues presented in the petition, the scope of the discovery requested, the length of time between the conviction and the post-conviction proceeding, the burden that would be imposed on the State and on any witnesses, and the availability of the evidence through other sources. *Johnson*, 205 Ill. 2d at 408. "A trial court does not abuse its discretion in denying a discovery request which ranges beyond the limited scope of a post-conviction proceeding and amounts to a 'fishing expedition.'" *Id.* We review a trial court's denial of a postconviction request for discovery for an abuse of discretion. *Fair*, 193 Ill. 2d at 265.

¶ 55     In the present case, we cannot say that the trial court abused its discretion in denying the defendant's request for postconviction discovery. The trial court considered relevant factors. The trial court considered that, because all the jurors denied knowing Morales during *voir dire*, the assertion of any relationship between Morales and a juror was rebutted by the record and any discovery would be repetitive. The trial court also considered that the jurors were only referred to by number during trial as this was a gang-related murder case and the jurors had a reasonable expectation of anonymity. Discovery could cause jurors to feel afraid or uncomfortable. The trial court also found that Danielle's assertion that she saw a juror wave to Morales in the courtroom, on the first day of trial where testimony was heard, was rebutted by the fact that Danielle and Morales were both on the potential witness list and would not have been in the courtroom at the same time. In light of the foregoing, we cannot say the trial court abused its discretion in denying the motion.

¶ 56     The defendant argues that he satisfied the good cause standard because the wave, gestures and embrace between the juror and Morales establish a possible relationship between the juror and

the victims' family. However, it also can be viewed as establishing nothing more than friendly or caring gestures from one woman to another. During *voir dire*, all the jurors indicated that they would be fair and impartial and that they would decide the case based on the facts presented. The alleged gestures at issue do not establish that the juror was not impartial. *Williams*, 209 Ill. 2d at 241-42.

¶ 57                                   III. CONCLUSION

¶ 58     For the reasons stated, we affirm the dismissal of the defendant's postconviction claims related to actual innocence and juror bias. We reverse the dismissal of the defendant's claim that defense counsel was ineffective in failing to call alibi witnesses at trial and we remand for an evidentiary hearing on that claim.

¶ 59     Affirmed in part and reversed in part; cause remanded.